791 So.2d 979 (2000)
Jeremiah JACKSON
v.
STATE.
CR-97-0998.
Court of Criminal Appeals of Alabama.
March 31, 2000.
Rehearing Denied June 2, 2000.
*989 Shirley Trivett Chapin, Tuscaloosa; and Ellen L. Wiesner, Brookfield, Wisconsin, for appellant.
Bill Pryor, atty. gen.; and Jeremy W. Armstrong and James R. Houts, asst. attys. gen., for appellee.
LONG, Presiding Judge.
The appellant, Jeremiah Jackson, was convicted of murder made capital because it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Jackson be sentenced to death. The trial court accepted the jury's recommendation and sentenced Jackson to death.
*990 The State's evidence tended to show the following. On April 15, 1996, at approximately 1:45 p.m., Jackson and Alfred Reed, Jackson's codefendant,[1] robbed the Hillview Grocery Store on County Road 24 in Bibb County. Jackson was armed with a 12-gauge shotgun. The clerk and owner of the store, Vicki Carroll, was talking on the telephone with her husband, Jerry Carroll, when Jackson and Reed entered the store. Jerry Carroll testified that while he was talking with his wife, he heard her scream, "Take it. Take it all. Take all of it." (R. 389.) Mr. Carroll immediately asked his wife if she was being robbed, and she said that she was. Mr. Carroll then hung up and telephoned 911 to report the robbery.
Testimony showed that Vicki Carroll was killed during the robbery by a closerange shotgun blast to her forehead. Photographs of the scene showed fragments of Carroll's skull and brain tissue scattered throughout the store. Bloodstains found in the bottom of the empty drawer of the cash register indicated that the shooting occurred after all the cash had been removed from the register. Pellets from a 12-gauge shotgun shell were found in the store. John R. McDuffy, a forensic scientist with the Alabama Department of Forensic Sciences, testified that the splatter of blood and tissue throughout the store and the location of the shotgun pellets indicated that the fatal shot was fired from behind the counter, within a few feet of Carroll.
Larry Sanders, an acquaintance of Jackson's, testified that he was driving home from work at approximately 4:00 p.m. on April 15, 1996, when Jackson and another individual flagged him down. Sanders stated that he gave Jackson and the other individual a ride to Chris Dobyne's house in Brent. Sanders testified that Jackson did not appear intoxicated at the time.
Angela Smith testified that she was living with Chris Dobyne, Alfred Reed, and John Martin in April 1996. On the morning of April 15, 1996, she and Dobyne were at Dobyne's mother's house when Reed and Martin came over. Smith testified that Reed, Martin, and Dobyne went outside and engaged in a conversation, during which she saw Dobyne continually shaking his head in the negative. Reed and Martin then left, she said. Later that day, at approximately 4:00 p.m., according to Smith, Martin arrived at Dobyne's house and stated that a woman had been murdered. Approximately 15 minutes later, Reed and Jackson arrived, and Jackson, Reed, Martin, and Dobyne began talking. According to Smith, Jackson stated that he had killed a woman, that he had "blowed her brains out." (R. 578.) In addition, Smith testified that she heard someone say that he had thrown the gun in the river; she did not identify who made that statement. Smith also stated that Jackson did not appear to be intoxicated or on drugs on April 15. The next afternoon, Jackson again came over to Dobyne's house. This time, Jackson had a newspaper containing an article about the robbery and murder at the Hillview Grocery Store. According to Smith, Jackson stated that "he [had] made [the] news." (R. 578.)
In his statement to police, Jackson admitted shooting Vicki Carroll during the robbery of the Hillview Grocery Store, but he claimed that the shooting was accidental. *991 Jackson told police that at approximately 8:30 a.m. on the day of the murder, Martin and Reed picked him up in Martin's car on Bear Creek Road. The three of them then drove around Bibb County for several hours, drinking beer and smoking marijuana, before Martin came up with the idea of robbing the store. According to Jackson, they then drove to Marion, where Reed retrieved a sawed-off 12-gauge shotgun from under the hood of his car. Reed gave the gun to Jackson. Jackson told police that after they got the gun from Reed's car, they drove by the Hillview Grocery Store five or six times (they even stopped at the store to buy beer at one point) before they robbed it. Jackson said that the last time they drove by the store, there were no cars in sight, so Martin stopped and let Jackson and Reed out of the car. Martin arranged to pick Jackson and Reed up at a cemetery down the road after the robbery. Jackson told police that when he entered the store, the female clerk was talking on the telephone. He then went behind the counter, pulled out the shotgun, and told the clerk, several times, to lie on the floor. Jackson said that he heard the woman say, "Yeah" into the telephone and that he believed she was telling someone she was being robbed. He said that he was "nervous and shaking" and that he then heard a shot; however, he said he did not remember pulling the trigger of the shotgun. According to Jackson, Reed did not take the money from the cash register until after the shot had been fired. Reed and Jackson then fled the scene. Jackson stated that when they got outside the store, he gave the shotgun to Reed and then ran into the woods. When he later met Reed at the cemetery, Reed did not have the shotgun. Jackson said that Reed told him that he had "got rid of the shotgun." Because Martin did not meet them at the cemetery as planned, Jackson and Reed walked to Chris Dobyne's house in Brent. There, Jackson, Reed, Martin, and Dobyne split the money from the robbery. The total amount of money taken from the store was approximately $200.
On appeal, Jackson raises 28 issues, many of which he did not raise by objection in the trial court. Because Jackson was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148 1152 (5th Cir. 1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Cr.App. *992 1998). This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we now address each of the 28 issues Jackson raises.

I.
Jackson contends that the trial court erred in failing to conduct a competency hearing because, he says, his pretrial mental evaluation "raise[d] serious questions as to [his] competenc[y]" to stand trial. (Issue XIII in Jackson's brief to this court, p. 77.) Because this claim was never presented to the trial court, our review will be under the plain-error rule. See Rule 45A, Ala.R.App.P.
The record reflects that Jackson initially pleaded not guilty by reason of mental disease or defect.[2] Based on Jackson's plea and on the State's motion requesting that Jackson be ordered to submit to a mental evaluation, the trial court ordered a psychological examination to determine whether Jackson was competent to stand trial and also to determine his mental state at the time of the murder. Dr. Vonciel C. Smith, a forensic examiner at the Taylor Hardin Secure Medical Facility, evaluated Jackson on September 24, 1996. In his evaluation report, Dr. Smith made the following findings relevant to Jackson's competency to stand trial:
"[T]he available data is inconsistent with formal thought disorder, major affective disturbance, or severe cognitive impairment. However, the defendant appears to function in the borderline range of intelligence. This intellectual functioning appears to be cultural familial in origin and of long-standing duration. Despite these limited cognitive abilities, Mr. Jackson was able to profit from concrete educational efforts on my part during the formal competency evaluation....
"Jeremiah Jackson was administered the Competency to Stand Trial Assessment Instrument (CAI) as part of the evaluation of his ability to assume the role of a defendant. The CAI is a semistructured interview designed to measure the defendant's knowledge and understanding in 13 areas related to trial competency. Again, while the defendant initially denied knowledge of the relevant parameters, following reinstitution of the interview process, he displayed adequate information in all domains.
"Specifically, Mr. Jackson understood that he was charged with Capital Murder. He accurately stated that his charge was a felony, and that the penalties which could be attached were `life without or death penalty.' At this part of the interview, the defendant went on to display information related to preliminary hearings as well as the use of youthful offender status. Mr. Jackson spontaneously named defense counsel and indicated some difficulty in their relationship. He complained that `me and my attorney don't see eye to eye... he don't come see me ... (but) then get in front of DA and Judge (and) act like he be on my side.' In the abstract, Mr. Jackson stated that defense counsel was `suppose[d] to represent me.' From *993 a further conversation, it appears that Mr. Jackson's concerns relate to inconsistencies between what he would like his attorney to say to him and his attorney's desire to present facts to him as objectively as possible. The defendant stated that the prosecuting attorney was his adversary. He indicated that the role of the judge was to `keep order in court.' Mr. Jackson defined the jury as consisting of 12 individuals who `decide is you guilty or not guilty.' He stated that witnesses were charged with the task of `tell(ing) the truth.' The defendant's difficulties with language somewhat impaired his ability to describe the use of plea bargaining. However, Mr. Jackson understood that `they ain't offered me nothing. They were suppose[d] to do that at my preliminary hearing.'
"Mr. Jackson appears, especially given his presentation today, highly motivated to avoid continued incarceration. He has some difficulty relating to current defense counsel. However, in the abstract, Mr. Jackson understood the appropriate role between a defendant and [his] attorney. In fact, he indicated from time to time the constraints placed on his interaction with me at times represented suggestions received from defense counsel. He understood that there were penalties which could be attached to offering unmanageable behavior at trial. As the defendant was able to maintain appropriate comportment, in the context of this interview, he should be able to maintain behavioral control at trial as well if he so desires. Again, given his language difficulties, the defendant might require somewhat more coaching from defense counsel in order to testify relevantly in his own behalf, than would other defendants. However, again, as previously mentioned, he responded well to concrete educational efforts over the context of today's interview and should be able to profit from the same with defense counsel.
". . . .
"In summary ... Mr. Jackson appears to display some situational distress, but fails to meet the criteria for a diagnosis of major affective disturbance or formal thought disorder. He appears to function in the borderline range of intelligence and this intellectual/cognitive deficiency appears to be cultural familial in origin and somewhat complicated by his minimal participation in the educational process as a younger individual. Despite the aforementioned deficits, Mr. Jackson appears to understand the roles of various members of the court and seems able to operate within it with the assistance of counsel.... Consequently, I recommend the defendant be allowed to proceed with the disposition of the charges against him."
(C. 907-10.) Dr. Smith also found that, at the time of the murder and at the time of his evaluation, Jackson did not suffer from a mental disease or defect that would affect his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
Rule 11.1, Ala.R.Crim.P., states: "A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant." Rule 11.6(a), Ala.R.Crim.P., states, in pertinent part:
"After the examinations have been completed and the reports have been submitted to the circuit court, the judge shall review the reports of the psychologists or psychiatrists and, if reasonable *994 grounds exist to doubt the defendant's mental competency, the judge shall set a hearing not more than forty-two (42) days after the date the judge received the report...."
Clearly, "a trial court has an independent duty to inquire into an accused's state of mind when there are reasonable grounds to doubt the accused's competency to stand trial." Ex parte LaFlore, 445 So.2d 932, 934 (Ala.1983). However, "[i]t is the burden of a defendant who seeks a pretrial competency hearing to show that a reasonable or bona fide doubt as to his competency exists." Woodall v. State, 730 So.2d 627, 647, (Ala.Cr.App. 1997), aff'd. in relevant part, 730 So.2d 652 (Ala.1998)(emphasis added). "`The determination of whether a reasonable doubt of sanity exists is a matter within the sound discretion of the trial court and may be raised on appeal only upon a showing of an abuse of discretion.'" Id. See also Tankersley v. State, 724 So.2d 557, 564 (Ala.Cr. App.1998).
In his brief to this court, Jackson complains that Dr. Smith's report raised what he terms "troublesome issues"such as Jackson's "borderline range of intelligence" and his apparent "language difficulties"and he argues that these issues created a reasonable and bona fide doubt as to his competency. (Jackson's brief to this court, pp. 77-78.) However, we find that Jackson has not met his burden of showing that a reasonable or bona fide doubt existed as to his competency to stand trial. Jackson's apparent "language difficulties" and "borderline intelligence," alone, are not sufficient to establish a reasonable doubt as to his competency. See, e.g., M.D. v. State, 701 So.2d 58 (Ala.Cr.App. 1997)(low IQ or borderline intelligence alone does not automatically render one incompetent). Dr. Smith stated in his report that Jackson was competent to stand trialthat he understood the proceedings against him; the possible penalties; the roles of his attorney, the prosecutor, the judge, and the jury; and that he was able to assist his lawyers in his defense. See, e.g., Dobyne v. State, 672 So.2d 1319 (Ala. Cr.App.1994), aff'd, 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)(trial court did not err in failing to hold competency hearing where forensic examiner's report indicated that defendant was competent to stand trial). "`In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity and warrant an inquiry into his competency.'" Tankersley, 724 So.2d at 557, quoting Cliff v. State, 518 So.2d 786, 791 (Ala. Cr.App.1987).
Accordingly, we find no error, and certainly no plain error, as to this claim.

II.
Jackson contends that the trial court erred in denying his motion for a change of venue based on allegedly prejudicial pretrial publicity. (Issue XXIII in Jackson's brief to this court.) Specifically, he argues that the extent of the publicity coupled with "the veniremembers' familiarity with the case" deprived him of his right to a fair trial. (Jackson's brief to this court, pp. 105-06.)
Before trial, Jackson filed a motion for a change of venue, alleging that the newspapers, and television and radio stations in Bibb County had published and broadcast what he says was "extensive and highly prejudicial" material regarding both the murder and his arrest. (C. 987.) No evidentiary hearing was held on the motion and Jackson provided no evidence to support the conclusory allegations made in his motion. Nevertheless, the trial court deferred *995 ruling on the motion until after voir dire examination, stating that a change of venue would be required only "[i]f we can't get a jury." (R. 14.) It does not appear from the record that Jackson renewed his motion after voir dire or that the trial court ever ruled on the motion. Accordingly, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court stated the following regarding motions for a change of venue:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978)."
479 So.2d at 80.
When requesting a change of venue, "[t]he burden of proof is on the defendant to `show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.'" Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___, ___ (Ala.Cr.App.1999), quoting Rule 10.1(b), Ala.R.Crim.P. Here, Jackson did nothing more than make "bare allegations that there was prejudicial pretrial publicity and that this publicity biased the jurors." Hyde v. State, 778 So.2d 199, 232 (Ala.Cr.App.1998). See also Henderson v. State, 612 So.2d 1256, 1258 (Ala.Cr.App. 1992) ("A bare allegation is not sufficient to prove that the defendant was actually prejudiced or that the community was so saturated with prejudicial publicity as to render the trial setting inherently suspect."); Callahan v. State, 557 So.2d 1292, 1306 (Ala.Cr.App.), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990)("Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground.").
At trial, Jackson presented no evidence to support his motion for a change *996 of venue: he presented no newspaper articles or other exhibits detailing the alleged publicity surrounding the case. On appeal, Jackson makes no allegation that any prospective juror should have been, but was not, struck because of exposure to pretrial publicity. He contends only that "many of the veniremembers had ... been exposed to pretrial publicity." (Jackson's brief to this court, p. 105.) "`"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. State, 562 So.2d 586, 589 (Ala.Cr.App. 1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The members of the jury venire in this case were extensively and thoroughly examinedin both group and individual, sequestered settingsregarding their knowledge about the case. While the majority of prospective jurors acknowledged some awareness of the robbery and murder, each prospective juror who indicated such an awareness also indicated that anything he or she had read or heard would not affect his or her ability to remain impartial. There is simply nothing in the record "to suggest that the jurors selected for the trial jury could not render a verdict based solely on the evidence presented at trial." Ex parte Neal, 731 So.2d 621, 623 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999).
Accordingly, we find no error, plain or otherwise, in the trial court's denial of Jackson's motion for a change of venue.

III.
Jackson contends that the trial court erred in denying his motion for a continuance. (Issue XXIV in Jackson's brief to this court.) The record does not contain a written motion for a continuance; however, on the first day of trial, the following occurred:
"[Defense cocounsel]: I'm Shirley Chapin and I'm an attorney in Tuscaloosa. I often work with Mr. Bivens [Jackson's lead defense counsel]. I got notification that he requested I be appointed to sit as second chair in Jeremiah Jackson's case. At that time, I contacted my doctor to find out if I was able to do that and still follow my doctor's orders. I'm having surgery two weeks from today and I've been ordered bed rest for quite sometime now. I contacted Mr. Bivens and contacted this court by fax with a copy of a letter from my doctor stating that I was not able to be here. We met with Mr. Bivens in his office and attempted to contact other attorneys to sit as second chair on Friday and were unsuccessful in finding an attorney [who] would agree to sit second chair. Therefore, because of the ruling by the Court and the length of time we've had it, I feel an obligation to be here today. I do not know if I'll be able to stay throughout the trial. I'll do my best and would ask for some consideration if I have to get up and leave.
"[The Court]: Certainly.
"[Chapin]: And I will do my best to make sure it does not interfere in any way with the trial. But I'm here against doctor's orders and [I'm] on some rather serious medication.
"[The Court]: Let the record be real clear now. Mr. Jackson had retained Mr. Tony Burke and several months ago he fired him. Why, I don't know. At that time I appointed two attorneys for *997 him, Andrew Smith and Jim Standridge out of Tuscaloosa, very competent, experienced attorneys who have handled a lot of capital litigation. Approximately a month ago, I'm not sure of the exact date, Mr. Jackson retained Mr. Bivens, who is also very experienced, well qualified attorney in this matter. Mr. Bivens was aware from the beginning that this case was set for trial today. He asked me would I appoint someone to help him. Since the defendant is indigent, I told him I would.
"I don't think there's a constitutional right to a second-chair attorney, but since Mr. Bivens asked for some help, I told him I would let him have that and that's been done. I don't know when you were notified or requested to come in, but one day last week, less than a week ago was when my office got a call regarding your condition and that you wanted a continuance. My statement was, if that's going to prevent you from being an attorney, then I wasn't going to appoint you because the case is not going to be continued. Everybody has known for about six months this case is set for trial today. But anyway, we'll give you whatever consideration you need.
"[Bivens]: We want to make sure that was known to the court. She's going to make every effort to function with maybe a little bit of awkwardness.
"[The Court]: If you need to get up and leave, that's all right.
"[Bivens]: Or she may need to leave early, we want the record to reflect that.
"[Prosecutor]: I need to ask this question. Is there any concern on behalf of the defendant, you, Mr. Bivens, that Mrs. Chapin is not capable of assisting you in this matter because of her medical problems?
"[Bivens]: No. And, Jeremiah, I've talked with him about it. She'll be okay. We just wanted to be clear with the Court that there's expected to be times when she'll ask to leave or have to get up and leave and we didn't want that to impact upon the trial. We're here today ready to go forward with the case."
(R. 11-14.)
On appeal, Jackson contends that the trial court improperly denied Ms. Chapin's request for a continuance because, he says, Mr. Bivens, who was retained approximately one month before trial, did not have adequate time to prepare a defense and because Ms. Chapin was on "heavy medication" and was present against medical advice. As stated above, the record contains no written request for a continuance. The above-quoted exchange suggests that Ms. Chapin orally requested a continuance approximately one week before trial. However, the grounds for that motion are not in the record. Given the substance of the discussion between the court and defense counsel on the first day of trial, we can only assume that Ms. Chapin's request for a continuance was due to her medical condition; the record contains no reference to Mr. Bivens's alleged lack of time to prepare. Accordingly, we may review Jackson's claim that Mr. Bivens did not have adequate time to prepare for trial only for plain error. See Rule 45A, Ala. R.App.P.
Contrary to Jackson's contention, there is no evidence in the record that his lead counsel, Mr. Bivens, was not prepared for trial. Mr. Bivens was retained approximately one month before trial. He stated on the first day of trial that he was "ready to go forward with the case"; and the record reveals that Mr. Bivens zealously defended his client throughout the trial. Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ *998 (Ala.Cr.App.1998)("Counsel's belief that they would have been better prepared with more time is a belief shared by every trial judge and lawyer who has ever been involved in a trial.").
"The trial court has broad discretion in granting a continuance when the basis for the motion is that counsel has not had sufficient time to prepare or to develop his defense. Godfrey v. State, 383 So.2d 575, 577 (Ala.Cr.App.), cert. denied, 383 So.2d 579 (Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980), citing Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968). `A motion for a continuance due to a lack of time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a [plain and palpable] showing of abuse.' Reynolds v. State, 539 So.2d 428, 429 (Ala.Cr.App.1988), cert. denied, 539 So.2d 428 (1989). Moreover, `the reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion." Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).' Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), writ denied, 372 So.2d 44 (Ala.1979)."
Loggins v. State, 771 So.2d 1070, 1084 (Ala.Cr.App.1999). (Emphasis added in Loggins.) Jackson has failed to show an abuse of discretion.
Moreover, Jackson's claim that he was entitled to a continuance because of Ms. Chapin's medical condition is equally meritless. First, Jackson has failed to show that he was prejudiced by Ms. Chapin's medical condition. Although Ms. Chapin indicated that she was present at Jackson's trial against medical advice, she and Mr. Bivens indicated that she was fully capable of acting as cocounsel and that the matter had been discussed with Jackson prior to trial. Further, even if Ms. Chapin's performance had been compromised by her medical condition, Jackson's lead counsel, Mr. Bivens, was fully competent and prepared to try the case. There is no evidence that Jackson "could not be adequately represented by the remaining attorney." Jenkins v. State, 384 So.2d 1135, 1139 (Ala.Cr.App.1979), cert. denied, 384 So.2d 1141 (Ala.1980). See also Adkins v. State, 600 So.2d 1054, 1061 (Ala.Cr.App.1990), remanded on other grounds, 600 So.2d 1067 (Ala.1992), aff'd. on return to remand, 639 So.2d 515 (Ala. Cr.App.1993), aff'd, 662 So.2d 925 (Ala.), cert. denied, 513 U.S. 851, 115 S.Ct. 151, 130 L.Ed.2d 90 (1994)(in determining the propriety of a continuance, the trial court should consider whether the defendant has other competent counsel to represent him).
Accordingly, we find no error, and certainly no plain error, in the trial court's denial of Jackson's request for a continuance.

IV.
Jackson contends that the trial court erred in allowing the jury to separate over his objection, in violation of Rule 19.3, Ala.R.Crim.P., which, at the time of Jackson's trial, required the trial court to obtain the consent of both the defense and the prosecution before allowing the jury to separate. (Issue XIV in Jackson's brief to this court.) This issue has been raised and decided adversely to Jackson on numerous occasions. See, e.g., Ex parte Stewart, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Ex parte Smith, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999); Loggins v. State, 771 So.2d 1070 (Ala.Cr.App.1999); Drinkard v. State, 777 So.2d 225 (Ala.Cr. *999 App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000); Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998).
In Ex parte Stewart, the Alabama Supreme Court held that § 12-16-9, Ala. Code 1975, as that statute was amended in 1995, and not Rule 19.3, Ala.R.Crim.P., which became effective in 1991, controlled the issue of jury separation.[3] Section 12-16-9, Ala.Code 1975, vests the trial court with the discretion to allow the jury to separate without the consent of the defense or the prosecution. Accordingly, it was within the trial court's discretion to allow the jury to separate without Jackson's consent.
Nevertheless, Jackson contends that even if the trial court did have the authority to allow the jury to separate without his consent, the trial court abused its discretion in so doing. Specifically, he argues that because the press remained in the courtroom throughout the trial and had allegedly contacted defense counsel requesting to speak to the jurors, and because, he says, there had been extensive pretrial publicity about the case, allowing the jury to separate denied him his right to a fair trial by an impartial jury. However, he offers no evidence that any juror was influenced by the alleged publicity or that any juror was contacted by a representative of the press.
In addition, after the jury was sworn, the trial court instructed the jurors as follows:
"As I told you folks yesterday, I do not plan to sequester you, but I will admonish you throughout the trial to avoid any contact with anyone about the case. Any newspaper, television, any other type of media accounts of the case. If anyone should attempt to contact any of you about this case, you need to report it to me immediately so I can deal with it."
(R. 368-69.) The jury was properly instructed on the danger of "outside influences"; jurors are presumed to follow the trial court's oral instructions. Taylor v. State, 666 So.2d 36, 70 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Because we find no indication in the record that the jury was influenced or tainted by outside factors, we simply cannot say that the trial court abused its discretion in denying Jackson's motion to sequester the jury.

V.
Jackson contends that the trial court erroneously instructed the first panel of the jury venire during voir dire examination. (Issues I and II in Jackson's brief to this court.) Because Jackson did not object to the court's allegedly erroneous instructions, we may review this claim only for plain error.[4] See Rule 45A, Ala. R.App.P.
The record reveals that the 108-member venire was divided into two panels for death qualification. During defense counsel's questioning of the first panel of prospective jurors, the following occurred:

*1000 "[Defense counsel]: It is not a lawyer's responsibility or duty to tell you what the law is. But I am going to try to make sure that you understand a fundamental definition. Are there any of you ladies and gentlemen who do not, do not understand that life in prison without parole means exactly what it says? That there is no parole? A person sentenced to live in prison without parole simply never gets out of prison. Is there anybody that has an understanding about that that is different from what I have just stated? There aren't any circumstances which a person receiving life in prison without parole gets out of prison. Is there anybody that understands that any different than the way I have just stated?
"(No response.)
"[Defense counsel]: Are there any of you ladies and gentlemen on the jury [who] believe that the premise I have just stated to you, that life in prison without parole means a person never gets out of prison or are there any of you who simply believe that is not true? Yes, sir?
"[Prospective juror L.P.]: I don't believe it. I believe there has been mishappenings where a person has walked away from life without parole by accident or whatever.
"[Defense counsel]: [L.P.], you're telling the Court that you simply do not believe that is true? You do not believe that life in prison without parole means life in prison without parole. You never get out of prison?
"[Prospective juror L.P.]: That's correct.
"[Defense counsel]: All right. Is it your thinking that there could be a change in the law or something else that would occur that would allow a person sentenced to life in prison without parole to get out?
"[Prospective juror L.P.]: There's a possibility, a mishappening in the judicial system. Overcrowding or they accidentally let the person walk out or something like that.
"[Defense counsel]: Now, is there anyone else that feels the same way? Yes, sir, [G.S.]?
"[Prospective juror G.S.]: I'm of the same opinion as the gentlemen back here that our system does make mistakes, whether intentional or not, could be made. They could at some time release a prisoner that has been sentenced to life without parole.
"[Defense counsel]: Thank you. Yes, sir?
"[Prospective juror J.A.]: Some have been sentenced to life without parole and walks out. I've heard of them.
"[Defense counsel]: So, [J.A.], does that lead you to the logical conclusion that a sentence of life in prison without parole is not appropriate, an unworkable alternative in a capital murder conviction?
"[Prospective juror J.A.]: No, sir, because I know some that were in the penitentiary since 1980 that are still there.
"[Defense counsel]: To you, does life in prison without parole mean life in prison without parole or does it not?
"[Prospective juror J.A.]: Would you ask that question a different way?
"[Defense counsel]: That's the best I can do. To you, when a person is sentenced to live in prison without parole, does that mean to you that they are in prison forever?
"[Prospective juror J.A.]: No, sir.
"[Defense counsel]: It does not?
"[Prospective juror J.A.]: No, sir.

*1001 "[Defense counsel]: Does it follow then that if you're selected on this jury and you do not believe that life in prison without parole means that a person never gets out of prison, that you would then select the death penalty as opposed to life in prison without parole?
"[Prospective juror J.A.]: Could you ask that question differently? I would go by the evidence presented by the prosecutor and defense. Whereas if it's life without parole I would consider his chances and charges and the evidence and if there's no technicality that can be reached that will get him out of prison, he'd stay there for life without parole, I might go along with life without parole.
"[Defense counsel]: But you would have to have evidence that no technicality could come up in the future? No possibility that this individual would accidentally be released?
"[Prospective juror J.A.]: Absolutely.
"[Defense counsel]: Before you could vote for life without parole?
"[Prospective juror J.A.]: That's true.
"[Defense counsel]: Is that correct?
"[Prospective juror J.A.]: Yes, sir.
"[Defense counsel]: You would need pretty much a guarantee to that effect?
"[Prospective juror J.A.]: Pardon me?
"[Defense counsel]: You would need pretty much a guarantee to that effect?
"[Prospective juror J.A.]: Not necessarily a guarantee. A reasonable explanation or reasonable understanding on my part that there's no technicality going to get him out of the penitentiary and he's going to be in there. They have writ writers in the penitentiaries and they have all kinds of loop holes and technicalities. I'll watch the prosecution and the defendant and if there are any technicalities, that's the way I'll vote.
"[Defense counsel]: Are there any members of the jury who, jury panel, who likewise feel that you would have to have some type of evidence or guarantee that life in prison without parole would mean that the individual would never get out of the prison before you would select that as the alternative to the death penalty? Are there any of you that feel the same way? [E.L.N.]?
"[Prospective juror E.L.N.]: I have a question to that. Is that not already a guarantee?
"[The Court]: Let me say this.
"[Prospective juror E.L.N.]: I'm confused here, because, you know, if I'm going to sit on a jury of capital murder and it's not already guaranteed life without parole is exactly life without parole, then I would definitely vote for the death penalty. But I thought that was already guaranteed at the time that if it's life without parole, it's life without parole."
(R. 165-69.) At this point, the trial court interjected and made the following statement, about which Jackson now complains on appeal, regarding the term "life in prison without parole":
"[The Court]: Let me say that's the law right now. There are no guarantees, there are no certainties in life. Anything could happen. We could be invaded by Russians and they could take over, and they would put us in jail if they wanted to. But the law as it is written right now says that's your penalty. The law as it is written means life without parole. And as [L.P.] said, there was a case that happened in Tuscaloosa County where a young man was not serving a life without parole sentence, but was serving some other sentence, and he was released by mistake and went to New York and New York wouldn't send him back. That may be *1002 what [L.P.] was talking about. But what we're talking about is as the law is written now, life without parole means life without parole and if you're sentenced to thatpeople appeal all the time and have their cases overturned. That's not what we're asking about. No matter what his sentence would be, if there's some problem with the trial or some reason for the case to be reversed, that would come down the pike no matter what kind of sentence anybody received. But as much as I can guarantee anything, life without parole means life without parole."
(R. 169-70.)
Jackson contends that the above-quoted "instruction" from the trial court erroneously told the venire that "the appellate courts, and not the jury or the trial court, would ultimately ensure that the guilt and sentencing verdicts were correct," in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). (Jackson's brief to this court, p. 1.) In addition, he contends that the "instruction" improperly told the venire that a change in law in the future could result in Jackson's being released from prison. As stated above, Jackson did not object to the court's comments. While the lack of an objection does not prevent our review of this issue, it does weigh heavily against any claim of prejudice Jackson now makes on appeal. See, e.g., Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Cr.App.1999); Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
In Caldwell, the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29, 105 S.Ct. at 2639. The Court found that "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." 472 U.S. at 333, 105 S.Ct. at 2641-42.
Unlike Caldwell, however, we do not believe that the trial court's comments in this case diminished the jury's role or detracted from the jury's responsibility in the proceedings. In Caldwell, the prosecutor, during the sentencing-phase arguments, told the jury that its "decision [was] not the final decision," because "it is automatically reviewable by the Supreme Court." 472 U.S. at 325, 105 S.Ct. at 2637-38. The trial court then exacerbated the error by telling the jury that its decision was "reviewable automatically as the death penalty commands." 472 U.S. at 325, 105 S.Ct. at 2638.
Here, however, the trial court did not tell the prospective jurors that another body would review their factual determination as to Jackson's guilt or sentence; nor did the court tell the jury that its decisions were not the final decisions. Rather, in response to confusion during voir dire regarding the meaning of "life without parole," the trial court merely attempted to explain that term. That explanation was in direct response to one juror's statement (which was in response to Jackson's counsel's question) that he would need some "guarantee" or "evidence" that no "technicalities," "loopholes," or "mistakes" would allow Jackson to be released from prison if he was sentenced to life without parole. The trial court then explained that there *1003 could be no "guarantees" or "certainties" in life. In the same breath, the trial court noted that the Russians could invade or Jackson's case could get overturned on appeal "if there was some problem with the trial," but that such possibilities existed regardless of the sentence imposed. Clearly, the trial court was merely impressing upon the venire that such possibilities were unlikely and should not be considered in determining Jackson's sentence; it was not telling jurors, directly or indirectly, that their decision regarding Jackson's guilt and sentence was not the final decision. Contrary to Jackson's contention, the jurors could not have reasonably interpreted the comments to mean that the responsibility for determining Jackson's guilt and sentence lay elsewhere or that their decision would be reviewed. Thus, the trial court's comments did not violate Caldwell.
Nor do we believe that the comments improperly told the venire that if Jackson was sentenced to life imprisonment without parole a change in law could allow Jackson to be released at some time in the future. Clearly, nowhere in the comments did the trial court mention a change in the law. In fact, the only reference to a change in the law regarding life without parole was made by Jackson's counsel, not the trial court. As stated above, the trial court was merely addressing the concerns expressed by some of the prospective jurors about "technicalities," "loopholes," and "mistakes"; the court in no way stated, suggested, or implied that a "change in the law might negate their verdicts." (Jackson's brief to this court, p. 13.) The trial court specifically stated that "as much as I can guarantee anything, life without parole means life without parole." Further, at the penalty phase, the trial court instructed the jury as follows:
"Before you vote, you should carefully weigh, sift and consider the evidence with all of you realizing that a human life is at stake; you should bring to bear your best judgment which is the sole issue before you; that is, whether or not the defendant should be sentenced to life imprisonment without parole or death.
"Life imprisonment without parole means never. The law of this state is that if you sentence the defendant to life imprisonment without parole, he will never be paroled."
(R. 796.)
While we recognize that "[i]nforming the jury that the legislature may change the definition of life imprisonment without parole in the future is improper," Pressley v. State, 770 So.2d 115, 125 (Ala.Cr.App. 1999), aff'd, 770 So.2d 143 (Ala.2000), and that "comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case," are improper, Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984), we do not believe that such improper comments were made here.
Accordingly, we find no error, plain or otherwise, in the trial court's explanation of the term "life without parole."

VI.
Jackson contends that he was denied his right to be present at all stages of the proceedings because he was absent during a portion of the striking of the jury. (Issue VI in Jackson's brief to this court.) Specifically, he maintains that his absence during the first six peremptory strikes, exercised by both the defense and the prosecution, deprived him "of his right to exercise peremptory challenges." (Jackson's brief to this court, p. 42.) Because Jackson did not object to his absence at *1004 trial, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
Rule 9.1(a), Ala.R.Crim.P., provides that a "defendant has the right to be present at the arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing." At the time of Jackson's trial, a capital defendant could not waive his right to be present. See Rule 9.1(b)(2)(i), Ala.R.Crim.P.[5] However, Alabama courts held "that if a capital defendant is absent from noncritical stages of trial and if his presence would not have benefitted his defense, no error occurs." Burgess v. State, 723 So.2d 742, 760 (Ala. Cr.App.1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999), citing Harris v. State, 632 So.2d 503, 510-12 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
"`Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."'" Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998), quoting Finney v. Zant, 709 F.2d 643, 646 (11th Cir.1983), quoting, in turn, Snyder v. Massachusetts, 291 U.S. 97, 107-8, 54 S.Ct. 330, 78 L.Ed. 674 (1934). In Harris, supra, this court stated:
"`A defendant's right to be present at all stages of a criminal trial derives from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); Hopt v. Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884). This right extends to all hearings that are an essential part of the triali.e., to all proceedings at which the defendant's presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Compare Hopt v. Utah, supra (defendant has right to be present at empaneling of jurors); Bartone v. United States, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963)(court cannot impose sentence in absence of defendant); with United States v. Howell, 514 F.2d 710(5th Cir. 1975); cert. denied, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976)(no right to be present at in camera conference concerning attempted bribe of juror); United States v. Gradsky, 434 F.2d 880 (5th Cir.1970), cert. denied, 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972)(right to presence does not extend to evidentiary hearing on suppression motion.)'"
632 So.2d at 511, quoting Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).
Here, the record reflects that Jackson was absent from the courtroom during the State's first six peremptory strikes and during the defense's first six peremptory strikes. However, Jackson was present during voir dire examination, where he had the opportunity to learn about the members of the jury panel and to assess the potential composition of the jury; he was present during all the challenges for cause; he was present during *1005 the State's nine remaining peremptory strikes and during the defense's nine remaining peremptory strikes; and he was present when the trial court formally announced the members of the jury at the conclusion of the striking process. Although we recognize that jury selection is a critical stage of the trial, we fail to see how Jackson was prejudiced by his absence from the first six peremptory strikes, or how the outcome of the trial might have changed if he had been present during those strikes.
Jackson contends that his presence was necessary because, he says, the State violated Batson by striking the only four black veniremembers. (See Part VII of this opinion.) However, Jackson has failed to show how his presence would have altered the State's strikes, and the record reflects that Jackson was present when his counsel made a Batson motion challenging those strikes.
Jackson also claims that his presence was required so that he could give "input" to his counsel regarding the possible relationships between him and the potential jurors. (A review of voir dire indicates that several veniremembers were friends of Jackson's or of his family.) However, the record does not indicate, and Jackson does not contend, that he was denied an opportunity to consult with his counsel during or after voir dire examination regarding his challenges for cause and peremptory strikes; the record simply indicates that Jackson left the room just prior to the striking of the jury and returned after the first six strikes had been exercised. The record does not indicate the reason for Jackson's departure, and there is no indication that Jackson's absence was anything other than voluntary. Further, Jackson does not contend that his counsel failed to strike any prospective jurors Jackson believes should have been stricken, or that his counsel struck jurors he wanted to remain on the jury. There is simply no indication, or even an allegation, that the striking process would have been different had Jackson been present.
Moreover, neither Jackson nor his counsel objected to Jackson's absence from the first six peremptory strikes; clearly they did not feel that any prejudice resulted from Jackson's absence.
Absent any showing of prejudice, we simply cannot find that Jackson's absence during the first six peremptory strikes was error, plain or otherwise.

VII.
Jackson contends that the State used its peremptory strikes in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Issue VIII in Jackson's brief to this court.)
The record reflects that after the jury was struck, but before it was sworn, Jackson made a Batson motion, alleging that the State had improperly used its first four peremptory strikes to remove the only four black veniremembers on the jury venire (prospective jurors D.C., T.J., A.S., and J.S.). The trial court found that Jackson had made a prima facie case of racial discrimination and requested that the State give its reasons for the strikes. The State then offered several reasons for striking each of the four black veniremembers; the trial court found the State's reasons to be race neutral and denied Jackson's Batson motion.
"The party alleging racially discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). Once a prima facie case has been established, a presumption is created that the *1006 peremptory challenges were used to discriminate against black jurors. Id. at 623. Where the prosecutor is required to explain his peremptory strikes, he or she must offer `"a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. However, this showing need not rise to the level of a challenge for cause."` McLeod v. State, 581 So.2d 1144, 1155 (Ala.Cr.App.1990), quoting Ex parte Branch, 526 So.2d at 623. (Emphasis in Branch; citation omitted.) Once the responding party has articulated a raceneutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is "clearly erroneous." Id. at 625."
Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998), aff'd. in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___ So.2d ___ (Ala.2000).
The record reflects that in response to the trial court's request, the prosecutor stated the following regarding his strikes of D.C., T.J., A.S., and J.S.:
"Judge, the allegation of the prima facie case that it's done for some racially discriminatory reason we deny that fact and state that our strikes were based generally on their knowledge, connection, or our position, knowledge, or connection with the defendant or previous records or opposition with reference to capital punishment or a combination thereof.
"We would also like to, well, basically, the first strike we had was [D.C.], a black male who said he knows the defendant. A good friend of his. He told us in voir dire he couldn't serve on the case because of his friendship. Indicated at one point that he was opposed to capital punishment, then said he could do it. He does have a record of arrests including burglary and a recent assault in which he did not reply on his form that he turned in. He admitted on voir dire that he simply did not state that properly. We struck him for those reasons.
"The next strike was 111, [T.J.], a black female. I understand she had a record and had opposition to capital punishment. If my memory serves me correctly, it was some knowledge or connection with the defendant.
"The next one was 201, [A.S.]. a black male, who said he was a friend of the defendant. He talked with him in jail. He came to Court and indicated in voir dire that he couldn't serve on this case and had a relationship that would prevent him from rendering a fair verdict. He said he was generally opposed to the death penalty and indicated that he could consider the evidence and could put this aside and we struck him on those grounds. It appeared to us that he had a change of position.
"Then number 211 was our next strike, [J.S.], a black female. General opposition to capital punishment. Indicated clearly that she has a kinsman who is now locked up and she keeps the kids for her and I understand that kinsman is doing time for murder and she keeps her kids for her. She did not mention this on her form. She was asked about family people and so forth that are in trouble with the law. We struck her on those grounds. I understood she had some knowledge or association with the defendant."
(R. 361-62.)
"The fact that a prospective juror knows the defendant or his family is *1007 a valid race-neutral reason for striking that juror.'" Russell v. State, 739 So.2d 58, 65 (Ala.Cr.App.1999), quoting Temmis v. State, 665 So.2d 953, 953 (Ala.Cr.App. 1994). "We have held that strikes based on previous criminal charges, prosecutions, or convictions of the veniremember or a family member of the veniremember are not racially discriminatory as such." Thomas v. State, 611 So.2d 416, 418 (Ala. Cr.App.), cert. denied, 611 So.2d 420 (Ala. 1992). See also Douglas v. State, 740 So.2d 485, 487 (Ala.Cr.App.1999). Moreover, it is well settled that "[a] veniremember's expression of reservations concerning the death penalty may be a valid race-neutral reason for striking a prospective juror." Burton v. State, 651 So.2d 641, 649 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); McGahee v. State, 554 So.2d 454 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989), cert. denied, 513 U.S. 1189, 115 S.Ct. 1251, 131 L.Ed.2d 132 (1995).
Here, the State articulated raceneutral reasons for each peremptory strike it exercised against a black prospective juror. Prospective jurors D.C., T.J., and A.S. all indicated during voir dire that they knew Jackson and/or his family. Prospective juror D.C. had been accused of burglary and assault, but failed to respond to this question during general voir dire or on his jury questionnaire; only after he was confronted with the information by the prosecutor during individual sequestered voir dire did D.C. admit to lying on his questionnaire and during general voir dire. Prospective juror J.S. indicated during voir dire that she would prefer not to serve on the jury because she was taking care of her sister's children while her sister was in prison, but she, too, failed to respond on her jury questionnaire about friends and family with convictions or charges. In addition, prospective jurors T.J. and J.S. both indicated a strong opposition to capital punishment. These were sufficiently race-neutral reasons for striking the four black veniremembers.
Jackson contends, however, that "the State's explanation that some of the struck veniremembers had been involved with the law or had family members who had committed crimes is suspect," because, he says, juror L.E., a white female who ultimately sat on Jackson's jury, stated during voir dire that she had a brother who had been charged with a crime and who was currently in a "boys' home" where he was being treated for mental problems and drug abuse. (Jackson's brief to this court, pp. 52-53.) The State's disparate treatment of black and white jurors with the same characteristics, Jackson maintains, raises the inference of discrimination. We disagree.
Although L.E. did indicate that her brother had been in trouble, L.E. did not lie on her questionnaire or during general voir dire about this fact; D.C. and J.S. did. Moreover, L.E. did not indicate that she was opposed to capital punishment as did both T.J. and J.S., nor did L.E. indicate that she knew Jackson as did D.C., T.J., and A.S. Contrary to Jackson's contention, L.E. did not have the same characteristics as the black veniremembers who were struck.[6]
*1008 After the State articulated race-neutral reasons for its strikes, the burden then shifted to Jackson to offer evidence showing that those reasons were merely shams or pretextual. Although Jackson alleged, both at trial and on appeal, that the State's reasons were merely pretextual, he has failed to show this. Thus, the trial court's denial of Jackson's Batson motion was not "clearly erroneous."

VIII.
Jackson contends that the trial court erred in admitting into evidence the statement he made to police because, he says, the statement was involuntary. (Issue XVI in Jackson's brief to this court.) Specifically, he contends that his impaired mental ability and low intellectual functioning prevented him from understanding his Miranda rights and prevented him from making a knowing and voluntary waiver of those rights.
Prior to trial, Jackson filed a motion to suppress his statement to police, alleging that his statement was the result of an illegal arrest; that his statement was coerced; and that he was not properly advised of his Miranda rights. However, he did not contend, as he now contends on appeal, that he was unable to understand his rights because of his alleged mental impairment and low intellectual functioning. The record reflects that the trial court held a hearing on Jackson's motion to suppress on January 16, 1997; however, Jackson failed to include a transcript of that hearing in the record on appeal. "`It is the appellant's duty to provide this court with a complete record on appeal.'" McCray v. State, 629 So.2d 729, 733 (Ala. Cr.App.1993). Because the sparse record on this issue reflects that the ground Jackson now raises on appeal regarding his statementthat he was unable to understand or voluntarily waive his Miranda rights due to his mental impairment and low intellectual functioningwas never raised in the trial court, we may review his claim only for plain error. See Rule 45A, Ala.R.App.P.
"Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala.1985). For a confession to be properly admitted, the State must prove that `"the defendant was informed of his Miranda rights and that the confession was voluntarily given."` Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App.1996)(quoting Mann v. State, 581 So.2d 22, 23 (Ala.Cr.App. 1991)).
"`"In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence."'

"Howard v. State, 678 So.2d 302, 306 (Ala.Cr.App.1996) (quoting Dixon v. State, 588 So.2d 903, 907 (Ala.1991))."
"`"`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility *1009 choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991).'"

"Rutledge v. State, 680 So.2d 997, 1002 (Ala.Cr.App.1996)."
Maples v. State, 758 So.2d 1, 41 (Ala.Cr. App.1999), aff'd, 758 So.2d 81 (Ala.1999). When determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession. Maples, 758 So.2d at 41.
At trial, Cpl. Kenneth Michael Manlief, a criminal investigator with the Alabama Bureau of Investigation, testified that he took a statement from Jackson on April 26, 1996. Cpl. Manlief testified that before Jackson gave the statement, he read Jackson his Miranda rights, and Jackson indicated that he understood those rights and signed a waiver-of-rights form. Cpl. Manlief stated that he did not coerce Jackson into making a statement, that he did not threaten Jackson, and that he made no promises to Jackson nor did he give Jackson any hope of reward in return for making a statement. Further, Cpl. Manlief stated that when he made his statement Jackson did not appear to be intoxicated or on drugs, nor did he appear to be suffering from any illness or injuries. Doug Vinson, Chief of the Brent Police Department, who was also present when Jackson gave his statement, corroborated Cpl. Manlief's testimony.
On appeal, Jackson contends that his statement should have been suppressed because, he says, he did not understand the Miranda rights that Cpl. Manlief read to him, and he therefore did not knowingly and voluntarily waive those rights. In support of this contention, Jackson relies on expert testimony he presented during the sentencing phase of his trialtestimony that was never presented to the trial court when it considered Jackson's motion to suppress prior to trial and that was never presented during the guilt phase of Jackson's trial. At sentencing, Jackson presented the testimony and a written report of Dr. John Goff, a clinical neuropsychologist who examined Jackson two days before trial. Dr. Goff's report indicated that Jackson's IQ was 72, in the borderline range of intelligence; that Jackson has problems with language and communication; and that Jackson "appear[ed]" not to understand the right to remain silent." (C. 1160-66.) However, Dr. Goff's report also indicated that Jackson was competent to stand trial and that he was not suffering from any "functional psychological disturbance." (C. 1164.)
In Dobyne v. State, 672 So.2d 1319 (Ala. Cr.App.1994), aff'd, 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), we stated the following regarding the impact of a low IQ on the voluntariness of a confession:
"Having a low IQ will not render a waiver ineffective unless the individual's IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Cr.App. 1984).
"`We have often held that "the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary." See Colorado v. Connelly, 479 U.S. 157, *1010 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin, supra, Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).'

"Youngblood v. State, 656 So.2d 385, 387 (Ala.Cr.App.1993).
"`[A] defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R.4th 16 (1981). "While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible." Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981).'

"Whittle v. State, 518 So.2d 793, 796-97 (Ala.Cr.App.1987)."
672 So.2d at 1337.
Although it is undisputed that Jackson's mental abilities were below average, and Dr. Goff's report indicated that Jackson "appear[ed]" not to understand the meaning of the right to remain silent, it is well settled that "`an expert opinion is not conclusive on the trier of fact even if the testimony was uncontroverted. Furthermore, the weight and credibility to be attributed to an expert witness is for the trier of fact.'" State v. Austin, 596 So.2d 598, 601 (Ala.Cr.App.1991), quoting Clark Lumber Co. v. Thornton, 360 So.2d 1019, 1021 (Ala.Civ.App.1978). Thus, even if Dr. Goff's report had been presented to the trial court when it ruled on Jackson's motion to suppresswhich it was notthe weight and credibility of the report would have been entirely within the trial court's discretion.
Given the totality of the circumstances, we cannot say that the trial court's denial of Jackson's motion to suppress was palpably contrary to the great weight of the evidence. Accordingly, we find no error, plain or otherwise, as to this claim.

IX.
Jackson contends that the trial court erred in allowing what he terms "irrelevant, highly emotional, and inflammatory" victim-impact evidence to be admitted during the guilt phase of his trial. (Issue XV in Jackson's brief to this court, pp. 83-84.) In addition, he contends that the State's opening and closing arguments at the guilt phasein which, Jackson says, the prosecutor "continually focused the jury's attention... on the character of the victim and the anguish suffered by her family because of her death"improperly "tipped the scales in favor of a capital murder verdict" by "guarantee[ing]" that the jurors would render a verdict based on "sympathy instead of their rational judgment." (Jackson's brief to this court, pp. 81-83.) Jackson did not object to any of the testimony or argument that he now complains of on appeal; thus, we will review his claims only for plain error. See Rule 45A, Ala. R.App.P.

A.
First, Jackson complains about the following evidence elicited through the testimony of the victim's husband, Jerry Carroll: (1) that Mr. Carroll and Vicki Carroll had two sons; (2) the names and ages of the two children; (3) that Vicki Carroll was a "loving" and "sweet" person whom everyone liked; and (4) that Vicki Carroll "was always helping people" in the community by extending store credit to those *1011 who did not have money to pay for groceries.
It is well settled that victimimpact statements "are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible." Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993), citing Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 (4th ed.1991). However, "when, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error." Crymes, 630 So.2d at 126. Rule 45, Ala.R.App.P., states:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
In Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), the Alabama Supreme Court stated:
"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of the trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecutor's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue."
678 So.2d at 236.
Here, as in Land, Mr. Carroll's testimony regarding his wife and their children was irrelevant to any issue in the case and was, thus, inadmissible. However, after reviewing the record as a whole, we find no evidence that the now-challenged testimony affected the outcome of the trial or that it otherwise prejudiced a substantial right of Jackson. See Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997), aff'd, 756 So.2d 957 (Ala.2000). Accordingly, we find no reversible error regarding this claim.

B.
Jackson also contends that the prosecutor improperly made victim-impact arguments during his opening and closing statements at the guilt phase by referring to the victim and her children and by suggesting what the victim would say if she could testify. Specifically, Jackson *1012 complains about the following comment by the prosecutor during opening statements:
"The case you're going to hear and the facts you're going to be presented with are about death. The kind of death that comes to a young mother of two who's running a neighborhood grocery, who's a happy, caring person, who helps people in their community when they need a little credit or their power bill is due, who's a good wife, working with her husband to make a place for her children."
(R. 370.) Jackson also complains about the following comment during the prosecutor's closing arguments:
"I don't want to sound crass, but if I understand the statement that this man gave [Cpl.] Manlief, they got about $200. I guess the price of the mothers, wives, friends, and store clerks [is] about $40 a pound [sic]. That's what he killed her for. That's the kind of cowardly, evil, malicious thing that these people did on that day and that's how senseless and unnecessary her death is.
"[Jerry Carroll] ... is going to have to live with this and his family the rest of his life. He hasn't seen the two boys deliberately since he put them through this. But this is their mother's day in court, it's the only day she'll get. It's as much her trial as it is Jeremiah Jackson's. She's not going to testify, she's in the grave. That is, most of her is. She can't testify from that stand.
"What were some of the things she said that day? She said, `Take it. Take it all. Are you being robbed? Yes. I'll call 911. Take it.' If she was here to testify, she would be saying, `why did he kill me? I gave him the money. I wasn't resisting, I didn't try to draw a gun, I didn't try to run out, why did he kill me? I want to be with my family, I want to raise my boys, I want to be with my community, I want to watch spring come this year. Why did he do that?' The answer is nothing except she just didn't give up her money quick enough. Store clerks are worth about $40 per pound in West Blocton."
(R. 632-33.)
The standard for reviewing a prosecutor's argument is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). "`This court has concluded that the failure to object to improper prosecutorial arguments, [as is the case here,] ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Furthermore:
"`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and *1013 are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Hutcherson v. State, 727 So.2d 846, 854-55 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), quoting Bankhead v. State, 585 So.2d 97, 106 (Ala. Cr.App.1989), aff'd. in pertinent part, remanded on other grounds, 585 So.2d 112, 127 (Ala.1991), aff'd. on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993).
We do not find that the prosecutor's comments, either alone or in conjunction with his other comments, were reversible error. The evidence of Jackson's guiltincluding his own confession to the crimewas compelling. The jury was properly instructed that it should base its verdict solely on the evidence in the case; that the statements and arguments of the attorneys were not to be considered as evidence; and that its verdict could not be based on sympathy, prejudice or emotion. "`The jury is presumed to follow the instructions given by the trial court.'" Frazier v. State, 758 So.2d 577, 604 (Ala.Cr. App.1999), aff'd, 758 So.2d 611 (Ala.1999), quoting Hutcherson, supra, at 854. Viewed in the context of the entire trial, we do not believe that the prosecutor's comments during opening or closing arguments about the victim affected the outcome of Jackson's trial or otherwise prejudiced Jackson. Accordingly, we find no reversible error regarding this claim.

X.
Jackson contends that the trial court erroneously "allowed into evidence damaging hearsay testimony that prejudiced his defense." (Issue XX in Jackson's brief to this court, p. 94.) Specifically, Jackson complains about the following testimony by Angela Smith: (1) that on the day of the robbery/murder, she heard Jackson's codefendant John Martin state that a woman had been murdered; and (2) that during a conversation between Jackson, Martin, Reed, and Dobyne, she overheard someoneshe did not identify whostate that the gun used in the robbery/murder had been thrown in the river. Jackson did not object to this testimony at trial; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
Even assuming that the testimony of Angela Smith was inadmissible hearsay, as urged by Jackson, we find that its admission was, at most, harmless error. See Rule 45, Ala.R.App.P. In James v. State, 723 So.2d 776 (Ala.Cr.App.), aff'd, 723 So.2d 786 (Ala.1998), we stated:
"There are numerous factors which can be considered in assessing harmless error, including `the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... and the overall strength of the prosecution's case.' Delaware v. Van Arsdall, 475 U.S. [673,] 684, 106 S.Ct. 1431[, 89 L.Ed.2d 674 (1986)]."
723 So.2d at 782. It is well settled that "testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." White v. State, 650 So.2d 538, 541 (Ala.Cr.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App.1995). See also Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App. 1995), aff'd, 675 So.2d 905 (Ala.1996)("The erroneous admission of evidence that is merely cumulative is harmless error."); Thompson v. State, 527 So.2d 777, 780 *1014 (Ala.Cr.App.1988)("Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.").
Here, Smith's testimony was merely cumulative of other evidence presented at trial,[7] primarily Jackson's own statement to police, and was, therefore, harmless. In his statement to police, Jackson admitted shooting and killing Vicki Carroll during the April 15, 1996, robbery of the Hillview Grocery Store, and Jackson told police that his codefendant Alfred Reed disposed of the gun used in the robbery/murder after they fled the scene. Smith's testimony that she heard Martin state that a woman had been murdered and that she heard someone say that the gun had been thrown into the river was, therefore, merely cumulative of Jackson's statement to police. Accordingly, any error in the admission of Smith's testimony was harmless. See, e.g., Flynn v. State, 745 So.2d 295 (Ala.Cr.App.), cert. denied, 745 So.2d 309 (Ala.1999); Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1997); Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997).

XI.
Jackson contends that the trial court erred in limiting his cross-examination of the Chief of the Brent Police Department, Doug Vinson, who was present during Jackson's statement to police, regarding the "routine procedure" of the police department in establishing an informant's understanding of the limits of their cooperation with police. (Issue XVIII in Jackson's brief to this court.) Jackson maintains that the trial court's action "prevented [him] from thoroughly cross-examining a State's witness on a key issue in the case." (Jackson's brief to this court, p. 92.)
Chief Vinson, who was present during Cpl. Manlief's interview with Jackson regarding the robbery/murder at the Hillview Grocery Store, testified that Jackson had worked in cooperation with the police on one occasion in February 1996. Apparently, Jackson had participated in a controlled drug buy set up by police, in which Jackson purchased narcotics from a suspected narcotics dealer. On cross-examination of Chief Vinson, the defense attempted to show that Jackson's statement to police regarding the robbery/murder in April 1996 was not voluntary because Jackson believed that he was still working for the police at that time and that he would be rewarded if he cooperated. During cross-examination of Chief Vinson, the following occurred:
"[Defense counsel]: Is it also routine procedure, whether or not it was specifically done, is it routine procedure to make sure that the person understands that level of cooperation is limited to the drug buy?
"[Prosecutor]: I object, it calls for speculation.
"[Defense counsel]: He can say yes or no.
"[The Court]: Sustained as to the routine."
(R. 541.) Defense counsel then went on to question Chief Vinson about whether he had specifically told Jackson, when Jackson was working with him in February 1996, that his cooperation with police was limited to purchasing narcotics and would not extend to anything else in the future; and whether he had told Jackson, during *1015 the interview in April 1996, that the current situation was not one in which Jackson was working for the police, as had been the case in February 1996.
"A party is entitled to a thorough and sifting cross-examination of the witnesses against him, § 12-21-137, Code of Alabama 1975; however, the trial court is vested with considerable control over the scope of the cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party. Perry v. Brakefield, 534 So.2d 602 (Ala.1988)."
McMillian v. State, 594 So.2d 1253, 1261 (Ala.Cr.App.1991). See also Hagood v. State, 777 So.2d 162 (Ala.Cr.App.1998), aff'd. in pertinent part, rev'd on other grounds, 777 So.2d 214 (Ala.1999).
We see no abuse of discretion here. Jackson had the opportunity to elicit testimony from Chief Vinson regarding what Jackson was told about the effect of his cooperation with police, both while he was cooperating in February 1996 and during his interview in April 1996; it was clearly established that neither Chief Vinson nor anyone else specifically spoke with Jackson on either occasion regarding the limits of his cooperation. The "routine" police procedure for informing cooperating witnesses about the extent of their cooperation would not have added anything material to the testimony that was already before the jury. Jackson has simply failed to show how he was prejudiced by the trial court's action in this regard. Accordingly, we find no error as to this claim.

XII.
In a two-paragraph argument in his brief, Jackson contends that the prosecutor used leading questions to elicit testimony from State's witnesses throughout the trial. (Issue XIX in Jackson's brief to this court.) In support of this argument, Jackson cites a series of page numbers in the record; however, he fails to identify the specific questions posed by the prosecutor that he believes were leading nor does he explain how these questions prejudiced him.
"We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts. We consider such reliance an indication of a lack of merit of the contention the party asserts."
Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999).
Despite Jackson's meager argument, we have nevertheless reviewed the entire record in this cause, including the page numbers cited by Jacksonwhich reveal no objection by Jackson to any of the prosecutor's questionsand find no error, plain or otherwise, in the State's questioning of its witnesses.

XIII.
Jackson contends that the trial court erred in admitting into evidence, during the guilt phase and the sentencing phase of his trial, what he claims were "inflammatory and highly prejudicial" photographs of the crime scene and of the shotgun wound to the victim. (Issue XVII in Jackson's brief to this court, p. 89.) He maintains that the prosecutor offered the photographs into evidence solely to inflame the jury and that the photographs "undermined the reliability of his conviction and death sentence." (Jackson's brief to this court, p. 89.) Jackson objected to the introduction of the photographs at the sentencing phase of his trial; however, he did not object to their introduction at the guilt phase. Therefore, with regard to the guilt *1016 phase, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
"This court has repeatedly held that autopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter." Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___, ___ (Ala.Cr.App.1999). See also Smith v. State, 756 So.2d 892 (Ala.Cr. App.1997); Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); Scroggins v. State, 727 So.2d 123 (Ala.Cr.App.1997), rev'd on other grounds, 727 So.2d 131 (Ala.1998); Boyd v. State, 715 So.2d 825 (1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Dabbs v. State, 518 So.2d 825 (Ala.Cr.App.1987). Further, "[p]hotographs that depict the crime scene are relevant and therefore are admissible." Wilson v. State, 777 So.2d 856, 929 (Ala.Cr.App.1999). See also Siebert, supra; Samra v. State, 771 So.2d 1108 (Ala.Cr.App.1999); Maples v. State, 758 So.2d 1 (Ala.Cr.App.), aff'd, 758 So.2d 81 (Ala.1999); Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Hill v. State, 516 So.2d 876 (Ala. Cr.App.1987). We have reviewed the photographs and find no error in their admission during the guilt or sentencing phases of Jackson's trial. See, e.g., Ex parte Bankhead, 585 So.2d 112 (Ala.1991); Ingram v. State, 779 So.2d 1225 (Ala.Cr.App. 1999).

XIV.
Jackson contends that the trial court erred in denying his motion for a judgment of acquittal, made at the close of the State's case and at the close of all evidence, because, he says, the evidence was insufficient to sustain his conviction for capital murder. (Issue XXVI in Jackson's brief to this court.) Specifically, Jackson contends that the highest offense he could have been convicted of was felony murder because, he says, he "lacked the specific intent to kill and the ability to form it because of mental retardation and intoxication." (Jackson's brief to this court, p. 111.) We disagree.
"`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d *1017 877 (Ala.1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala.1978).
"`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App.1976); Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. [398], 325 So.2d 531 [ (1976) ].
"`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala. Cr.App.[1976]). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App. 1976).

"`Freeman v. State, 505 So.2d 1079 (Ala.Cr.App.1986), quoting, Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala.1979).'"
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), quoted in Bankhead v. State, 585 So.2d 97, 104 (Ala. Cr.App.1989), aff'd. in part, remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd. on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993), and quoted with approval in Pilley v. State, 789 So.2d 870, 875-76 (Ala.Cr.App.1998), rev'd on other grounds, 789 So.2d 888 (Ala.2000).
"`"Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence."'" Pilley, 789 So.2d at 876, quoting Hunt v. State, 642 So.2d 999, 1008 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994). Intent "`"may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances."'" Farrior v. State, 728 So.2d 691, 695 (Ala. Cr.App.1998), quoting Jones v. State, 591 So.2d 569, 574 (Ala.Cr.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala.1980). See also Scanland v. State, 473 So.2d 1182, 1185 (Ala.Cr.App.), cert. denied, 474 U.S. 1035, 106 S.Ct. 602, 88 L.Ed.2d 581 (1985) ("[i]ntent may be inferred from the use of a deadly weapon"). In Davis v. State, 740 So.2d 1115 (Ala.Cr.App.1998), aff'd, 740 So.2d 1135 (Ala.1999), we stated:
"[T]he question of a defendant's intent at the time of the commission of a crime is usually a question for the jury. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983).
"`In Jones v. State, 591 So.2d 569, 574 (Ala.Cr.App.1991), this court stated:
"`"`The element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala. *1018 1980). Accord, Fears v. State, 451 So.2d 385, 387 (Ala.Cr.App.1984); Young v. State, 428 So.2d 155, 158 (Ala.Cr.App.1982)."
"`Additionally, in Bishop v. State, 482 So.2d 1322, 1326 (Ala.Cr.App.1985), this court held:
"`"`Intent may be presumed from the act of using a deadly weapon. McArdle v. State, 372 So.2d 897 (Ala.Cr.App.), cert. denied, 372 So.2d 902 (Ala.1979), and from the character of the assault, including the nature and amount of force used in the fatal injury. Flint v. State, 370 So.2d 332 (Ala.Cr.App. 1979).'
"`"Chaney v. State, 417 So.2d 625, 627 (Ala.Cr.App.1982). `However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him.' Free v. State, 455 So.2d 137 (Ala.Cr.App. 1984). In Underhill on Criminal Evidence, § 540 (3d ed.1923), we find the following statement regarding proof of intent in an attempted murder charge:
"`"`Thus, as a general rule, the force or violence which was employed must be proven to have been intentional.... The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another.'"'

"Long v. State, 668 So.2d 56, 60 (Ala.Cr. App.1995)."
740 So.2d at 1120. See also Hutcherson v. State, 727 So.2d 846 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).
Here, there was ample evidence that Jackson intended to kill Vicki Carroll. The following evidence was sufficient to support the jury's conclusion that Jackson had the intent to kill when he shot Carroll in the face from close range: the use of a deadly weapon; the circumstances surrounding the robbery/murder; the extent of the victim's injuries; Jackson's admission to police that he shot and killed Carroll; Jackson's statement that just before he shot Carroll, he believed she was telling someone over the telephone that she was being robbed; evidence that shortly after the murder, Jackson was bragging that he had "blowed her brains out"; and evidence that the day after the murder, Jackson was bragging about the offense having been reported in the local newspaper.
Jackson maintains, however, that he was so intoxicated at the time of the crime that he was unable to form the intent to kill. In Davis, supra, we stated the following regarding an identical argument:
"`The question whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state is also a question for the jury. See Ex parte Bankhead, *1019 585 So.2d 112, 121 (Ala.1991). Evidence of intoxication, whether voluntary or involuntary, is admissible when it is relevant to negate an element of the offense charged. § 13A-3-2(a). "Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent." Lovett v. State, 491 So.2d 1034, 1039 (Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala.1986)(quoting State v. Massey, 20 Ala.App. 56, 58, 100 So. 625, 627 (1924)). The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. Ex parte Bankhead, 585 So.2d at 121. The law concerning intoxication resulting from drug use is the same as intoxication resulting from alcohol. Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987).'

"Williams v. State, 710 So.2d 1276, 1338 (Ala.Cr.App.1996). To negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.
"`"In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App.1983)]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. ..."
"`Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991).' Smith v. State, 646 So.2d 704, 712-13 (Ala.Cr.App.1994)(emphasis added)."
740 So.2d at 1120-21. See also Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Crapps v. State, 646 So.2d 698 (Ala.Cr.App.1994).
Although there was some evidence found in Jackson's statement to police that Jackson had been drinking alcohol and smoking marijuana on the morning of the robbery/murder, this evidence in no way established that Jackson was so intoxicated that he was incapable of forming the intent to kill. Jackson presented no evidence as to how much alcohol he had drunk or how much marijuana he had smoked. In addition, Jackson's "`conduct and demeanor immediately after the crime provided a reasonable inference of sanity.'" Smith v. State, 646 So.2d 704, 713 (Ala.Cr.App.1994), quoting Cunningham v. State, 426 So.2d 484, 491 (Ala.Cr.App. 1982). Both Larry Sanders and Angela Smith testified that they saw Jackson approximately two hours after the robbery/murder and that he did not appear intoxicated or under the influence of any drugs. The trial court's instruction on the law of intoxication was proper. Obviously, the jury resolved the conflict in the evidence regarding Jackson's intoxication adversely to Jackson; we will not disturb that finding on appeal.
*1020 Jackson also contends that he was unable to form the intent to kill because of his mental impairment. However, as we stated in Part VIII of this opinion, Jackson presented no evidence of his alleged mental impairment during the guilt phase of his trial. The only evidence regarding his mental abilities was introduced at the sentencing phase of his trial for purposes of mitigation. Jackson cannot expect this court to reverse his conviction merely because he now wishes to change defense strategies and to argue evidence that was never presented during the guilt phase of his trial.
However, we point out that even had Jackson presented the evidence of his mental impairment during the guilt phase of his trial, such evidence in no way demonstrated that he was so mentally impaired as to be unable to form the intent to kill. See, e.g., McCray v. State, 591 So.2d 108 (Ala.Cr.App.1991). Jackson's own expert, Dr. Goff, stated in his report that Jackson had "the capacity to distinguish right from wrong at the time of the alleged offense" and that there were "no indications for a primary disorder of thought or mood or any other significant functional psychological disturbance" that would affect Jackson's ability to appreciate the criminality of his conduct or to conform his conduct to the law. (C. 1164.) Clearly, Jackson's mental capabilities were not so impaired as to prevent him from forming the intent to kill.
Because there was ample evidence to establish that Jackson had the intent to kill when he shot Vicki Carroll, the trial court did not err in denying Jackson's motion for a judgment of acquittal.

XV.
Jackson contends that the trial court's jury instructions during the guilt phase of his trial were erroneous. (Issues IX and XXII in Jackson's brief to this court.) Jackson never objected to the court's instructions on the grounds he now raises on appeal. Although Jackson's failure to object does not prevent our review of his claims, it does weigh against any claim of prejudice he now alleges on appeal. Thus, we review his claims only for plain error. See Rule 45A, Ala.R.App.P.

A.
First, Jackson contends that the trial court erroneously instructed the jury that it "was not to consider the voluntariness of [his] statement" to police. (Jackson's brief to this court, p. 54.) The trial court gave the following instruction regarding Jackson's statement to police:
"Evidence has been introduced concerning alleged statements made by the defendant, and while I determine the voluntariness of the statements, the jury determines their weight or credibility and you may disregard any alleged statement which you find to be unworthy of belief or which you entertain a reasonable doubt as to the truth of these statements."
(R. 654.)
In addressing an identical issue in Jackson v. State, 674 So.2d 1318 (Ala.Cr.App. 1993), aff'd. in pertinent part, rev'd on other grounds, 674 So.2d 1365 (Ala.1994), this court stated:
"In Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985), the Alabama Supreme Court addressed this issue, stating:
"`It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible. Clifton v. United States, 371 F.2d 354 (D.C.Cir.1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967); United States v. *1021 Inman, 352 F.2d 954 (4th Cir.1965). In the case at hand, however, the trial judge made it clear to the jury that they were to ultimately determine whether the confession was voluntary. We agree, therefore, with the Court of Criminal Appeals that there was no prejudicial error, since the comments of the trial judge "did not imply that the jury should accept and believe appellant's confession based on the trial court's ruling that the statement was voluntary."
"`. . . .
"`Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial court makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976).'
"(Emphasis original.)
"This court has previously addressed this issue in a similar situation where the trial court orally instructed the jury that, while the trial court determines the voluntariness of a defendant's statement, the jury has the exclusive prerogative of determining the credibility of the evidence or the weight to be accorded the evidence, so that the jury may disregard any of the statement that it considers to be unworthy of belief. Clark v. State, 621 So.2d 309 (Ala.Cr.App.1992). See also Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992) (no prejudicial error occurred where the trial court instructed the jury that it had found the confession to be voluntary, because the court also instructed the jury that it was to determine how much weight, if any, to give the confession). In Clark v. State, 621 So.2d at 325, this court held:
"`In the present case, as in Ex parte Singleton, the trial court's charge, when read as a whole, did not indicate that the jury should believe the appellant's confession because the trial court had determined it to be voluntary; nor did it indicate that the jury had no role in determining its voluntariness. Rather, the trial court's instructions informed the jury of its role in determining what weight should be given the confession.'"
674 So.2d at 1325. Moreover, in Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993), this court held that a charge identical to the one at issue here was not prejudicial. In so doing, we stated:
"While the trial judge erred by telling the jury that the court determines the voluntariness of the statements, we find the error not to be prejudicial because the judge also instructed the jurors that they were the ultimate decisionmakers as to how much weight, if any, the statement should be afforded."
621 So.2d at 355. See also Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997); Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997).
Similarly, in giving the charge in the present case, the trial court did not, as Jackson contends, take away the jury's function in determining the voluntariness of Jackson's statement. Although the court instructed the jury that it had initially determined the voluntariness of a statement, the court also instructed the jury that it should determine the weight and credibility of that statement. In addition, the court instructed the jury that it could *1022 disregard any statement by Jackson that it found "to be unworthy of belief" or to which the jury entertained "a reasonable doubt as to the truth" of the statement. The instructions did not misinform the jury of the law and did not adversely affect Jackson's substantial rights. Because the error in the court's instructions was not "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings,'" Bush v. State, 523 So.2d 538, 560 (Ala.Cr.App. 1988), quoting Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), it did not rise to the level of plain error.

B.
Jackson also contends that the trial court's instructions on lesser included offenses were confusing and misleading and ultimately precluded the jury from returning a verdict for anything less than capital murder. The record reveals that the trial court instructed the jury on the lesser included offenses of felony murder, intentional murder, manslaughter, and robbery. After instructing the jury on all the elements of the charged offense and the lesser included offenses (about which Jackson does not complain), the trial court instructed the jury as follows:
"I'm going to now attempt to summarize briefly what I have told you regarding the charges against the defendant and the lesser included offenses.
"You'll first consider whether the State has proven each and every element of the offense of murder during robbery. If you're convinced beyond a reasonable doubt that the State has proven each and every element of the offense of murder during robbery, then you should return a verdict finding the defendant guilty of murder during robbery, and you would give no consideration to the lesser included offenses.
"If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of murder during robbery, then you will consider the lesser included offenses.
"The first lesser included offense is felony murder. If the State has proven beyond a reasonable doubt the offense of felony murder, you will convict the defendant of felony murder.
"If all these elements are not proven beyond a reasonable doubt, then you will consider murder.
"If that's proven beyond a reasonable doubt, you would convict of murder.
"If that is not proven beyond a reasonable doubt, you would consider manslaughter. If the State has proven that beyond a reasonable doubt, you would convict him of manslaughter.
"If they have not proven manslaughter beyond a reasonable doubt, you would consider robbery in the first degree.
"If that's proven beyond a reasonable doubt, you would convict him of that. And, if not, you would not.
"Again, you would start with the most serious offense, murder during robbery. If proven beyond a reasonable doubt you would go no further.
"Only consider the lesser charges if the State has failed to prove all the elements of the more serious charge or charges."
(R. 651-52.)
Jackson contends that the trial court's instructions precluded the jury from finding him guilty of intentional murder and of robbery, as separate offenses and as lesser included offenses of capital murder, or of finding him guilty of manslaughter and of robbery, as separate offenses and as lesser *1023 included offenses of capital murder. In support of this argument, Jackson cites Hallford v. State, 548 So.2d 526 (Ala.Cr. App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), and Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986), in which this court held that "robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction" for capital murder. 500 So.2d at 63. He maintains that the facts in his case support the theory that he did not form the intent to rob the Hillview Grocery Store until after he shot and killed Vicki Carroll. Thus, he contends, the jury should have been instructed that if it found that he, in fact, did not form the intent to rob until after the killingi.e., that the robbery was a mere afterthoughtthen it could find him guilty either of intentional murder and robbery or of manslaughter and robbery as separate offenses.
Although we agree that an accused "is not guilty of capital robbery-murder where the intent to rob was formed only after the victim was killed," Connolly, 500 So.2d at 62, we find that in this case, despite Jackson's contention to the contrary, there was no theory of the evidence from which a reasonable jury could have concluded that Jackson did not have the intent to rob at the time of the killing. In his statement, Jackson admitted that he planned the robbery with his codefendants. At trial, Jackson's sole defense was that he did not intend to kill Carroll. Moreover, forensic evidence, introduced by the State showed that the cash had been removed from the cash register before Carroll was shot, indicating not only that Jackson intended to rob the store before he shot Carroll, but that the taking of money was actually completed before the shooting.
Because there was simply no theory of the evidence from which the jury could have possibly concluded that Jackson did not have the intent to rob at the time he shot Vicki Carroll, the above-cited instructions by the trial court were not erroneous. Nor was Jackson entitled to have the trial court specifically instruct the jury that it could return two separate verdicts finding him guilty of either intentional murder and robbery or guilty of manslaughter and robbery. There was no error, plain or otherwise, in the trial court's instructions.

XVI.
Jackson contends that the prosecutor's cross-examination of him during the sentencing phase of his trial was improper. (Issues III and X in Jackson's brief to this court.)
First, Jackson contends that the prosecutor improperly questioned him about the circumstances surrounding the crime and about his involvement in the crime. Specifically, Jackson contends that this questioning was improper because, he says, the circumstances surrounding the crime and his involvement in the crime were "irrelevant to the jury's sentencing task." (Jackson's brief to this court, p. 56.) Because Jackson did not object to the prosecutor's questions on the grounds he now raises on appeal, we may review this claim only for plain error. Rule 45A, Ala. R.App.P.
At the sentencing phase of his trial, Jackson testified on his own behalf. On direct examination, Jackson expressed remorse for Vicki Carroll's death and asked that the jury spare his life. On crossexamination, the prosecutor questioned Jackson about the circumstances surrounding the crime and about the accuracy of the statement he gave the police. Contrary to Jackson's contention on appeal, *1024 the circumstances surrounding the crime are relevant at sentencing. Moreover, Jackson's claimwhich amounts to nothing more than an assertion that he had the right to take the stand, make a speech about being remorseful, beg the jury to spare his life, and then leave without having to answer questions on cross-examinationis simply absurd; he had no such right. By taking the stand to testify on his own behalf, Jackson opened himself to cross-examination about any relevant matter, including the circumstances surrounding the crime. The lack of objection to this line of questioning indicates that Jackson and his counsel were aware of this when Jackson took the stand. There was no error here, plain or otherwise.
Jackson also contends that the prosecutor improperly questioned him about statements that his codefendant Alfred Reed made to police after the crime. The first instance about which Jackson complains is the following:
"[Prosecutor]: You get the money out of the cash register?
"[Jackson]: No, I didn't.
"[Prosecutor]: Who did?
"[Jackson]: Alfred Reed.
"[Prosecutor]: All right. Is that all Alfred Reed had to say about this?
"[Jackson]: I can't recall.
"[Prosecutor]: You can recall?
"[Jackson]: No, sir, I can't.
"[Prosecutor]: Would it refresh your memory if I told you that he said you got the money out?
"[Jackson]: That's a lie."
(R. 732.) Jackson did not object to this questioning. Later, the following occurred:
"[Prosecutor]: Where did you go after you went out the door?
"[Jackson]: In the woods.
"[Prosecutor]: Where did Alfred go?
"[Jackson]: In the woods.
"[Prosecutor]: You stick the gun back in your pants and walk stiff-legged again?
"[Jackson]: I gave it to Alfred Reed.
"[Prosecutor]: Do you know what Alfred Reed had to say about that?
"[Jackson]: I don't know, he just taken it and ran.
"[Prosecutor]: Do you know what Alfred Reed said about the gun?
"[Jackson]: I don't know.
"[Prosecutor]: Would it help you for me to tell you that he said you had the gun when you went out the door?
"[Defense counsel]: Objection.
"[The Court]: Sustained."
(R. 733.) Because Jackson either failed to object, or failed to receive an adverse ruling on his objection, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
It is well settled that a nontestifying codefendant's statement to police implicating the accused in the crime is inadmissible against the accused; it does not fall within any recognized exception to the hearsay rule and, absent a showing of reliability, its introduction violates the accused's confrontation rights. See Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); R.L.B. v. State, 647 So.2d 803 (Ala.Cr.App.1994); Ephraim v. State, 627 So.2d 1102 (Ala.Cr.App.1993).
However, even assuming that Jackson was denied his right of confrontation by the prosecutor's questions regarding Reed's statement to police, we find that any error was harmless. "A denial of the right to confrontation may, in some circumstances, result in harmless error." James v. State, 723 So.2d 776, 781 (Ala.Cr. *1025 App.), aff'd, 723 So.2d 786 (Ala.1998). In Whitehead v. State, 777 So.2d 781 (Ala.Cr. App.1999), we stated:
"`After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Cr. App.1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr. App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence.... In order for the error to be deemed harmless under Ala. R.App.P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing. We conclude that the error could not have contributed to the sentence, nor injuriously affected a substantial right of the appellant.'

"Davis v. State, 718 So.2d 1148, 1164 (Ala.Cr.App.1995); see also Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (`[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'). Further, plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. See Bush v. State, 695 So.2d 70, 87 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, [522] U.S. [969], 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Rule 45A, Ala.R.App.P. The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). This includes the improper admission of evidence at the sentencing stage of a capital case. See Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988)."
777 So.2d at 847.
We believe that the prosecutor's questions regarding Reed's statement to police were harmless beyond a reasonable doubt. Jackson admitted to police that he planned to rob the Hillview Grocery Store, that he entered the store armed with a sawed-off 12-gauge shotgun, and that he shot Vicki Carroll in the face. The jury found Jackson guilty of a capital crime. There was no question that Jackson was the shooter or that Jackson participated in the planning and execution of the robbery. Although Reed's statement to police was inconsistent with Jackson's statement to police and with Jackson's testimony at trial, we do not believe that the limited questions by the prosecutor regarding Reed's statementquestions that established only that Reed had said that Jackson took the money out of the register, and that Jackson maintained possession of the *1026 shotgun after the robberyaffected the jury's sentencing verdict. Accordingly, any error was harmless.

XVII.
Jackson contends that the prosecutor impermissibly used evidence of prior conduct during the sentencing phase of his trial "to prove and argue that [he] should be put to death." (Issue XI in Jackson's brief to this court, p. 59.) Specifically, Jackson contends: (1) that the prosecutor improperly introduced evidence, through the cross-examination of a character witness for the defense, that Jackson had previously been convicted of a misdemeanor (assault in the third degree) and that he had previously been suspended from school for carrying a gun; and (2) that the prosecutor improperly argued to the jury that this prior conduct negated the statutory mitigating circumstance of "no significant history of prior criminal activity," see § 13A-5-51(1), Ala.Code 1975, and that it should be considered as a nonstatutory aggravating circumstance. Jackson timely objected to the prosecutor's argument and moved for a mistrial. However, Jackson did not object to the testimony regarding his prior conduct; thus, we may review that claim only for plain error. See Rule 45A, Ala.R.App.P.
During the sentencing phase of his trial, Jackson called several character witnesses to testify on his behalf, presumably to establish a nonstatutory mitigating circumstance under § 13A-5-52, Ala.Code 1975 ("In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death"). Section 13A-5-45(g), Ala.Code 1975, states:
"The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
To rebut Jackson's claim of good character, the State cross-examined one of Jackson's character witnesses regarding Jackson's prior misdemeanor assault conviction and his suspension from school for carrying a gun. This cross-examination was proper both to test the witness's credibility as to his knowledge of Jackson's character and to rebut the mitigating evidence offered by Jackson. See Davis v. State, 740 So.2d 1115 (Ala.Cr.App.1998), aff'd, 740 So.2d 1135 (Ala.1999); Knotts v. State, 686 So.2d 431 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Peoples v. State, 510 So.2d 554 (Ala.Cr.App.1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987). Accordingly, we find no error, plain or otherwise, as to this claim.
Jackson also contends that the prosecutor improperly argued to the jury during his rebuttal closing arguments that Jackson's prior conduct negated the statutory mitigating circumstance of "no significant history of prior criminal activity" and that it should be considered as a nonstatutory aggravating circumstance. Specifically, Jackson complains about the following portion of the prosecutor's argument:
"The defense said, `[W]ell, you must not impose the penalty of death because he has no significant criminal record.' Visit with me a minute this defendant.

*1027 "What kind of fellow is he? Well, we know he's been to boot camp, we know he carried a gun to school, we know he has experience in the drug world, we know he's assaulted people, and we know in this case he committed a robbery. That's the sawed-off shotgun. We know that when he went to see Dr. Smith, he apparently lied to her to try to better himself. He worked as a drug snitch, and we know that apparently somewhere along the way in the last few weeks he tried to change his story that he told the officer."
(R. 770-71.)
Defense counsel objected to this argument and moved for a mistrial. The trial court denied the motion for a mistrial, but sustained the objection and immediately gave the following curative instruction to the jury:
"Ladies and gentlemen, I'll explain this to you in my charge later, but this particular mitigating circumstance, that is, the one regarding significant criminal history, for that to be disproved there must be some showing of prior felony convictions. Misdemeanors do not count to disprove a lack of significant prior criminal activity. Assault in the third degree is a misdemeanor."
(R. 773.)
During its oral charge, the court further instructed the jury that "[p]rior criminal activity requires actual prior felony convictions to disprove that mitigating circumstance." (R. 786.) Moreover, the court properly instructed the jury that it should base its verdict solely on the evidence in the case, and that statements and arguments of counsel were not evidence. A jury is presumed to follow the instructions of the trial court. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Thus, even assuming the prosecutor's argument to be error, we believe that the trial court's prompt curative instruction, coupled with its final instructions, abrogated any possibility that the jury used Jackson's prior conduct to negate the mitigating circumstance of "no significant history of prior criminal activity," and eradicated any prejudicial effect the argument may have otherwise had on the jury. See, e.g., Ex parte Jefferson, 473 So.2d 1110 (Ala.1985).
Moreover, we have reviewed the prosecutor's remarksboth in the context of the entire closing argument and in the context of the entire trialand we do not find that any of the comments amounted to argument of nonstatutory aggravation. To the contrary, the comments were proper comments based on the evidence introduced at trial and the inferences to be drawn from the evidence. "Whatever is in evidence at trial is considered subject to legitimate comment by counsel." Freeman v. State, 776 So.2d 160 (Ala.Cr.App. 1999). See also Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999), aff'd, 758 So.2d 611 (Ala.1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
In addition, the jury was properly instructed that it could consider only one aggravating circumstancethat the murder was committed during a robbery. There was no reasonable probability that the jury was misled or misinformed about its responsibility at sentencing and the appropriate factors that it could consider *1028 in aggravation. Thus, we find no error as to this claim.

XVIII.
Jackson contends that the prosecutor made improper remarks during opening and closing statements at both the guilt and sentencing phases of his trial. (Issue XII in Jackson's brief to this court.) Initially, we note the following:
"In reviewing these claims of improper prosecutorial comments, we must evaluate the comments in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). The question becomes `"whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process."` Darden v. Wainwright, 477 U.S. [168,] 182, 106 S.Ct. 2464, [91 L.Ed.2d 144 (1986) ], quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Further, we note that a prosecutor, in the closing argument, can state his or her interpretation of the applicable law. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), and can argue that the evidence presented at trial proves the guilt of the accused. Galloway v. State, 484 So.2d 1199 (Ala. Cr.App.1986). Additionally, we point out that the control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191 (Ala.Cr.App.1992). That court is in the best position to determine if counsel's argument and discussion is legitimate or if it degenerates into impropriety. Thomas, supra."
Smith v. State, 727 So.2d 147, 169-70 (Ala. Cr.App.1998), aff'd, 727 So.2d 173 (Ala. 1999).

A.
First, Jackson complains about numerous remarks by the prosecutor during opening and closing statements at the sentencing phase that, according to Jackson, amounted to argument of nonstatutory aggravating circumstances. At trial, Jackson objected to only one of the remarks he now complains of on appeal. As to the remarks that were not objected to, we review his claim for plain error. See Rule 45A, Ala.R.App.P.
After reviewing all of the complained-of comments by the prosecutor, both in the context in which they were made and in the context of the entire trial, we find that they were all within the bounds of legitimate comment by counsel. All of the comments were either proper argument or proper comments on the evidence and inferences to be drawn from that evidence, and did not constitute improper argument of nonstatutory aggravating circumstances. See, e.g., Freeman v. State, 776 So.2d 160, 185 (Ala.Cr.App.1999)("Whatever is in evidence at trial is considered subject to legitimate comment by counsel."); McWilliams v. State, 640 So.2d 982, 1001 (Ala.Cr.App. 1991), aff'd. in pertinent part, 640 So.2d 1015 (Ala.1993) ("deterrence, retribution, and society's right to self-defense" are proper subjects of prosecutorial argument). Accordingly, we find no error, plain or otherwise, as to this claim.

B.
Next, Jackson contends that the prosecutor improperly argued during rebuttal arguments at the sentencing phase that the jury had a "duty" to impose the death penalty. Specifically, Jackson complains about the following:
"We, the people of this country and this state ... decided through our legislature, our elected representatives, the penalty of death is lawful, proper and *1029 necessary punishment so that we can live in an orderly and safe society. It is part of our law, it's a part of our society and it is a tool that you must use in this case. It's not something you do easily or get any enjoyment. It's something you must be strong enough to be able to proceed with. In other words, that we can be a free and lawful and orderly society.
"I believe that the facts in this case have shown you the circumstances that are actually beyond belief that dictate the use of that tool.
"The facts in this case that you are called upon to impose and use the tool, the penalty of death, must be crystal clear, it must not be any doubt, no question at all about who did it, about what they did, and about why they did it. There's no doubt about what he did, and there is no doubt about why he and his buddies did it.
"They went down there for the dollar, the almighty dollar and they took her life for it and there's no dispute about that. There's not even any dispute about the facts. All we ask you is that in the morning when you get up and this is over with and you look yourselves in the mirror, you can say to yourself that I did my duty as imposed upon me by my community and my state."
(R. 769-70.) Jackson objected to this argument, and the trial court sustained the objection. The court then gave the following instruction to the jury:
"Ladies and gentlemen I'll ask you to disregard the last statement made by [the prosecutor]. Your duty is to weigh the aggravating and mitigating circumstances in this case and make a report to the court about that."
(R. 770.)
Although the trial court sustained Jackson's objection to this argument, we believe that the prosecutor's comments were proper both as a reply to defense counsel's closing arguments and as an argument that the death penalty was warranted under the facts in the case.
In his closing argument, defense counsel urged the jury to "follow the dictates of what a prayerful Christian individual should do," (R. 767-68); to "be strong enough" to impose life imprisonment without parole regardless of the pressures from the community, (R. 768); and to not impose the death penalty because "there's a sourness that comes later on when I realize I have not done what a civilized society expects of me." (R. 767.) The above-quoted portions of the prosecutor's argument were clearly a reply-in-kind to defense counsel's argument. "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994). See also, Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999); Melson v. State, 775 So.2d 857 (Ala.Cr. App.1999).
Further, we do not believe that the comments improperly told the jury that it was its duty to impose the death penalty regardless of the evidence. Generally, an exhortation to the jury to "do the right thing," to "do your job," or to "do your duty" is error if it "impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law." Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). However, after reviewing the prosecutor's comments in context of the entire argument and the entire trial, we find that the prosecutor was not asking the jury to ignore the evidence or the court's instructions. See, *1030 e.g., Thomas v. State, 766 So.2d 860 (Ala. Cr.App.1998); Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997). Rather, the prosecutor was validly arguing that the facts of the case supported the death penalty. "Of course, a prosecutor seeking a death penalty will argue that ... the defendant should receive the death penalty." Smith v. State, 727 So.2d 147, 171 (Ala.Cr.App. 1998).
Finally, even assuming the prosecutor's comments were improper, the trial court's prompt instruction to the jury to disregard the comments and its instructions on the jury's duty to weigh the aggravating and mitigating circumstances, cured any possible error.
Accordingly, we find no error as to this claim.

C.
Jackson also contends that the prosecutor, during closing arguments at both the guilt and sentencing phases of his trial, improperly relied on facts not in evidence. Jackson did not object to any of the remarks he now complains about on appeal; therefore, we may review this claim only for plain error. See Rule 45A, Ala. R.App.P.
First, Jackson contends that the prosecutor improperly argued at the guilt phase that Jackson planned the robbery, that Jackson loaded the shotgun before entering the Hillview Grocery Store, and that Jackson threw the shotgun in the river after the murder. All of these comments were legitimate inferences to be drawn from the evidence, and therefore, were proper. In Ballard v. State, 767 So.2d 1123 (Ala.Cr.App.1999), we stated:
"`The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982). "Statements of counsel in argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict." Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).'

"Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App.1986).
"`The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, 340 So.2d 1140 (Ala.1977). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Cr.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala. Cr.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Cr.App.1978).'"

"Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
767 So.2d at 1135.
Second, Jackson contends that the prosecutor improperly stated at the guilt phase that "Mr. Reed and Mr. Martin have their day to come in this matter. And come it will." (R. 631.) According to Jackson, this statement was "completely unsupported by the record" and "indicated to the jury that if [it] did not convict *1031 Jackson it was possible that nobody would be accountable for the victim's death." (Jackson's brief to this court, p. 74.) We disagree.
Contrary to Jackson's contention, the prosecutor's statement in no way suggested that no one would be held accountable if Jackson was acquitted. Rather, the statement assured the jury that Jackson's codefendants would be prosecuted just as Jackson had been. In addition, this statement was a reply-in-kind to defense counsel's repeated argument during his closing arguments that Jackson was not responsible for the murder of Vicki Carroll and that, instead, Reed and Martin were the culpable parties. As stated above, "[a] prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce, supra, at 609.
Third, Jackson contends that the prosecutor improperly argued to jurors at sentencing that Jackson had "deceived" them. In context, the prosecutor's argument was as follows:
"It's time, ladies and gentlemen, for y'all to consider what Jeremiah Jackson's fate is. There are two. One is life without parole, the one he's asking you to give him, it's the one that the man that's trying to persuade you that he's a pitiful guy and can't really function; the man who tried to present himself in a different light to Vonceil Smith, a man whose made his way trying to deceive you, wants you to do."
(R. 752.) These comments were clearly based on the evidence or were legitimate inferences to be drawn from the evidence. Dr. Smith's pretrial mental evaluation of Jackson states, in pertinent part, that Jackson was "initially invasive and highly invested in presenting himself poorly." (C. 906.) Moreover, during his testimony at the sentencing phase, Jackson attempted to persuade the jury, in direct contradiction to his statement to police, that when he entered the store with the shotgun, he did not know that a robbery was about to take place. The prosecutor's interpretation of Dr. Smith's report and Jackson's testimony was a proper subject for comment.
Fourth, Jackson contends that the prosecutor improperly told the jury that the death penalty was a "deterrent" to crime. Contrary to Jackson's contention, "`[a]n argument ... urging the jurors to consider the deterrent effect of the [death] penalty, is not improper.'" Kuenzel v. State, 577 So.2d 474, 504 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Brooks v. Kemp, 762 F.2d 1383, 1409 (11th Cir.1985), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986).
Accordingly, we find no error, much less plain error, as to Jackson's claim that the prosecutor improperly argued facts not in evidence.

D.
Finally, Jackson contends that the prosecutor "improperly compared the defendant's rights to those of the victim" during his closing arguments at the guilt phase. (Jackson's brief to this court, p. 75.) Specifically, Jackson complains about the following comment:
"[Jerry Carroll] ... is going to have to live with this and his family the rest of his life. He hasn't seen the two boys deliberately since he put them through this. But this is their mother's day in court, it's the only day she'll get. It's as much her trial as it is Jeremiah Jackson's. She's not going to testify, she's in the grave. That is, most of her is. She can't testify from that stand."
*1032 (R. 633.) (See also, Part IX of this opinion.) Jackson did not object to this comment by the prosecutor; therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In McNair v. State, 653 So.2d 320 (Ala. Cr.App.), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), this court addressed similar, although more egregious, comments than those complained about here. In McNair, the prosecutor made numerous comparisons between the victim's rights and those of the defendant's during his closing arguments at the guilt phase of the trial. We held that such comments were improper, but were not reversible error. In so doing, we stated:
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App. 1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991)(on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988)."
653 So.2d at 337-38. See also Griffin v. State, 790 So.2d 267 (Ala.Cr.App.1999); Woods v. State, 789 So.2d 896 (Ala.Cr.App. 1999); Thomas v. State, 766 So.2d 860 (Ala.Cr.App.1998); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
Similarly, we believe that the prosecutor's comments here were valued by the jury at their true worth and did not become factors in the formation of the verdict. The jury was properly instructed that arguments of counsel were not evidence. "`The jury is presumed to follow the instructions given by the trial court.'" Frazier v. State, 758 So.2d 577, 604 (Ala. Cr.App.1999), aff'd, 758 So.2d 611 (Ala. 1999), quoting Hutcherson v. State, 727 So.2d 846, 854 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). Accordingly, we find no error, plain or otherwise, regarding this claim.

XIX.
Jackson contends that the trial court failed to instruct the jury that it was required to vote for life imprisonment without the possibility of parole if it found that the aggravating circumstances and the mitigating circumstances were equal. (Issue XXI in Jackson's brief to this court.) Thus, Jackson concludes, the trial court's instructions were an "inaccurate statement of Alabama law" and "improperly created a presumption of death." (Jackson's brief to this court, pp. 97-100.) Because Jackson did not object to the trial court's instructions in this regard, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The instructions in this case were materially identical to the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 *1033 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
More importantly, however, instructions identical to those about which Jackson complains have repeatedly been upheld under challenges identical to the challenge Jackson brings. See Ex parte Trawick, 698 So.2d 162 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1999); Whitehead v. State, 777 So.2d 781 (Ala.Cr.App.1999); Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Accordingly, we find no error, plain or otherwise, as to this claim.

XX.
Jackson contends that the trial court relied on a cursory presentence report that, he says, was "grossly insufficient," and violated his right to a reliable and individualized sentence. (Issue V in Jackson's brief to this court, p. 35.) Specifically, he contends that although he presented a plethora of evidence about his background and personal history during trial, the presentence investigation report did not contain any of this information and was virtually identical to the youthful offender report that had been completed over a year before his trial. In addition, he complains that the report contained "suspect information," that, he says, shows that "the report was actually recycled from an earlier offense." (Jackson's brief to this court, pp. 36-39.) Jackson did not object to the presentence investigation report at the sentencing hearing; therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie's sentence and remanded the case for the trial court "to reconsider Guthrie's sentence with a sufficient presentence report." 689 So.2d at 947. In so doing, we stated:
"This presentence report's cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court's consideration of the full mosaic of Guthrie's background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b)."
Guthrie, 689 So.2d at 947. "The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury's advisory verdict is proper and if not, what the appropriate sentence should be." Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the "full mosaic of [Jackson's] background and circumstances" before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie's personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information *1034 for purposes of the presentence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson's trial, and, like the report in Guthrie, indicated that no psychological reports were on file when, in fact, Jackson had been evaluated both at the Taylor Hardin Secure Medical Facility approximately six months before trial and by his own expert only a week before trial, we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goff's and Dr. Smith's psychological evaluations containing extensive information about Jackson's life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not "hamstrung" into determining Jackson's sentence without consideration of "the full mosaic" of Jackson's background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App. 1999). Therefore, we find no error, plain or otherwise, as to this claim.

XXI.
Jackson contends that the trial court improperly treated robbery as both an element of the capital offense and as an aggravating circumstance. (Issue XXV in Jackson's brief to this court.) This practice, known as "double counting" or "overlapping," has repeatedly been upheld. See Ex parte Windsor, 683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Woods v. State, 789 So.2d 896 (Ala.Cr.App.1999); Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App. 1999); Sneed v. State, 783 So.2d 841 (Ala. Cr.App.1999); Maples v. State, 758 So.2d 1 (Ala.Cr.App.), aff'd, 758 So.2d 81 (Ala. 1999); Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___ (Ala.Cr. App.1999); Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000); Smith v. State, 756 So.2d 892, 904 (Ala.Cr.App. 1998), aff'd, 756 So.2d 957 (Ala.2000); Roberts v. State, 735 So.2d 1244 (Ala.Cr.App. 1997); Price v. State, 725 So.2d 1003 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Ivery v. State, 686 So.2d 495 (Ala.Cr.App.1996); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). Thus, we find no error in the trial court "double counting" robbery as both an element of the offense and as an aggravating circumstance.

XXII.
Jackson contends that the trial court erred in failing to consider evidence presented regarding the existence of statutory and nonstatutory mitigating circumstances. (Issue VII in Jackson's brief to this court.) Because Jackson did not *1035 object to the trial court's alleged failure, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"`A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors.' Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)(quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to present any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala. 1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Williams v. State, 710 So.2d 1276 (Ala. Cr.App., 1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987); Williams v. State."
Ingram v. State, 779 So.2d 1225, 1246 (Ala. Cr.App.1999). See also Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).

A.
First, Jackson contends that the trial court failed to consider his good behavior and ability to adjust to prison life as a nonstatutory mitigating circumstance, in contravention of Skipper v. South Carolina, 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986)("evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered as potentially mitigating ... [and] may not be excluded from the sentencer's consideration"). We disagree. In its sentencing order, the trial court stated:
"The defendant argues as a nonstatutory mitigating circumstance that he has shown an ability to adapt to the structured environment of jail or prison and that he has exhibited good behavior while in jail. The evidence supports this nonstatutory mitigating circumstance but it is a weak circumstance. It also shows that the defendant had the ability to conduct himself properly and not engage in criminal conduct. He voluntarily chose that course of conduct."
(C. 1088.) (Emphasis added.)
Contrary to Jackson's contention, the trial court not only considered his ability to adapt to prison life, but found that it *1036 constituted a nonstatutory mitigating circumstance. Merely because the trial court found it to be a "weak" circumstance does not mean the court failed to consider it. A sentencing authority can assign whatever weight it deems appropriate to those mitigating circumstances it finds to exist. Rutledge v. State, 523 So.2d 1087, 1103 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). Accordingly, we find no error, plain or otherwise, as to this claim.

B.
Second, Jackson contends that the trial court failed to consider his mental and emotional impairment as both statutory and nonstatutory mitigation. Specifically, Jackson contends that because he presented evidence that he was mentally retarded and was "easily led" by other people, the trial court was required to find the statutory mitigating circumstances that he was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975; that he was under extreme duress or the substantial domination of another person, see § 13A-5-51(5), Ala. Code 1975; and that he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, see § 13A-5-51(6), Ala.Code 1975. In addition, he contends that the trial court failed to consider the evidence of his mental impairment as a nonstatutory mitigating circumstance.
After reviewing the record, we find that the trial court considered all the evidence offered by Jackson in mitigation and did not restrict Jackson in any manner in his presentation of that evidence. Although the trial court did not find the existence of three statutory mitigating circumstances that Jackson claimed were present, the trial court's findings in this regard are fully supported by the record. The trial court's sentencing order states, in pertinent part:
"This Court is required to enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute. Mitigating circumstances are enumerated by statute in Section 13A-5-51, Ala.Code 1975. The Court hereby considers the existence or nonexistence of those mitigating circumstances in order as enumerated by the Code.
". . . .
"2. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. The defendant contended that this circumstance existed. The evidence showed that he was a special ed student while in school and was classified as EMR. This means he was considered educable mentally retarded. The evidence showed that his IQ level is between 69 and 72 [and] that he would be classified as suffering from mild mental retardation. The defense theory was that Jackson was under the influence of controlled substances and alcoholic beverages at the time of the offense and that he was under the domination of Reed and Martin. The evidence indicated, however, that Jackson knew exactly what he was doing. The only evidence of any drugs or alcohol was presented by Jackson. The only corroborative evidence of use of drugs or alcohol was use which occurred well after the offense occurred. The evidence showed that Jackson carried the gun, used the gun and there was no extreme emotional disturbance. Accordingly, the Court finds that this mitigating circumstance does not exist.
". . . .
"5. The defendant acted under extreme duress or under the substantial *1037 domination of another person. The Court finds that this mitigating circumstance does not exist. To the contrary, the evidence shows that he was not under any duress and certainly was under no domination of another person. He contended that Reed threatened him into committing the crime. However, Jackson had the gun and certainly had the opportunity to leave and could have protected himself against Reed if there was such a threat. Further, the evidence that the two left the store and escaped together indicates that he was not under any substantial domination of any person. They hid out together, hid their clothes together, caught a ride back to Brent together, and went out and celebrated afterwards together. The only evidence suggesting that the defendant acted under any duress or threat was from the defendant's statement. The defendant acted under no duress and under no domination of another person.
"6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The Court finds that this circumstance does not exist. While the evidence showed that the defendant suffered from a low intellectual level there was no evidence to show that he did not appreciate the criminality of his conduct and there was no credible evidence presented to show that he could not conform his conduct to the requirements of law."
(C. 1085-88.) The court also found "little in the defendant's character in general to be a nonstatutory mitigating factor." (C. 1089.)
In Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___ (Ala. Cr.App.1999), we stated the following regarding a similar claim:
"However, `[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981)]; Smith [v. State, 407 So.2d 894 (Fla.1981) ].' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). In Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994), this court stated:
"`We fully recognize that "[a] factfinder is not bound by expert testimony `even if all of the witnesses are presented by only one side.'" Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App. 1990). "In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). "An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues." Williams v. City of Northport, 557 So.2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, [498] U.S. [822], 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr. App.1984), affirmed, 470 So.2d 1309 *1038 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).'"
"599 So.2d at 1272."
___ So.2d at ___.
Here, the evidence supports the trial court's findings.[8] Jackson's own expert, Dr. Goff, found that Jackson was able to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Dr. Smith came to the same conclusion. Further, contrary to Jackson's contention, the mere fact that Dr. Goff found that Jackson was easily led and influenced by other people does not mandate the conclusion that Jackson was under extreme emotional disturbance or under duress or under the substantial domination of another person. Thus, the trial court was not required to find these mitigating circumstances.
Moreover, there is nothing to suggest that the trial court did not consider Jackson's mental impairment as nonstatutory mitigation. Although the court did not enumerate each piece of evidence submitted by Jackson regarding his mental impairment in the portion of its order addressing nonstatutory mitigating circumstances, such is not required, and does not mean that the court failed to consider the evidence. Roberts v. State, 735 So.2d 1244, 1267 (Ala.Cr.App.1997). In Rutledge, supra, we stated:
"`The fact that the sentencing order does not refer to the specific types of nonstatutory "mitigating" evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered.... What one person may view as mitigation, another may not.'"
523 So.2d at 1103-04, quoting Dobbert v. Strickland, 718 F.2d 1518, 1524 (11th Cir. 1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). Further, in Bush, supra, we stated:
"Thus, the trial court's failure to list and to make findings in its sentencing order as to all of the alleged nonstatutory mitigating circumstances offered by the appellant indicates only that it found the evidence not mentioned to be not mitigating, not that the evidence was not considered."
695 So.2d at 89.
Accordingly, we find no error, plain or otherwise, as to this claim.

XXIII.
Jackson contends that the trial court improperly considered extrajudicial factors from the trials of his codefendants in sentencing him to death which, he says, violated his rights to confrontation, cross-examination, and a reliable and individualized sentencing determination. (Issue IV in Jackson's brief to this court.)
The record reveals that the trial court held a sentencing hearing and sentenced Jackson to death on December 5, 1997, approximately 10 months after the jury returned its February 6, 1997, advisory verdict. In those 10 months between Jackson's sentencing hearings, the trial judge who presided over Jackson's trial also presided over the trial and sentencing of Jackson's codefendant Alfred Reed and accepted a guilty plea from codefendant John Martin.
Jackson identifies three findings of fact regarding the circumstances surrounding *1039 the crime in the trial court's sentencing order in this case, which, he says, "clearly show that the court considered the evidence from Reed's and Martin's case[s] in making [its] sentencing determination" regarding Jackson. (Jackson's brief to this court, p. 33.) Those findings are: (1) the specific route Jackson, Reed, and Martin drove on the morning of the murder, including directions and road names; (2) the fact that "Reed and Jackson made their escape through the woods later removing portions of their clothing and leaving them in the woods" (C. 1084); and (3) that "Martin, upon hearing the [gun]shot, drove off." (C. 1084.) He maintains that the inclusion of these extraneous facts in the sentencing order "undeniably prejudiced [him] by making him appear more culpable for the crime with which he stood convicted." (Jackson's brief to this court, p. 35.)
Although we agree that the above-cited findings in the portion of the trial court's order describing the offense were not based on evidence contained in the record of Jackson's trial, we find the error to be harmless. In Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996), we addressed an identical argument and stated:
"While some of the factual matters in the trial court's sentencing order were not based upon evidence contained in the record, we hold that error in the trial court's sentencing order is not so egregious as to require a new sentencing order.
"The purpose of requiring a trial court to issue a sentencing order in a capital case is to allow an appellate court to review a death sentence. See Fortenberry v. State, 545 So.2d 129, 144 (Ala. Cr.App.1988), aff'd, 545 So.2d 145 (Ala. 1989). `"As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are `so clear and convincing that virtually no reasonable person could differ,' a harmless error analysis can be used."' Id. (citations omitted). In this case, there was ample evidence and facts adduced from that evidence in this case that the murder was committed for pecuniary gain, justifying the imposition of a death sentence. Therefore, we must determine whether the trial court's referral to nonrecord evidence was harmless error.
"While the trial court refers to some extraneous matters in the sentencing order, it is clear that the trial court considered the statutory and nonstatutory mitigating circumstances in imposing sentence upon the appellant. Additionally, the trial court found only one aggravating circumstancethat the murder was committed for pecuniary gain. The sentencing order reflects that the trial court weighed the mitigating circumstances and the aggravating circumstance and there is no evidence that the trial court failed to consider the mitigating circumstances. The sentencing order does not reflect that the court considered any extraneous matter in imposing sentence against the appellant. Therefore, because the extraneous matters did not affect the trial court's proper weighing of the aggravating and mitigating circumstances, we find that the court's referral to some extraneous matter in its sentencing order was harmless error."
675 So.2d at 30.
Similarly, here, Jackson has failed to show that the inclusion in its order of facts from outside the record affected the trial court's weighing of the aggravating and mitigating circumstances or prejudiced its sentencing determination. Although Jackson contends that these facts made him *1040 more "culpable" in the eyes of the trial court, we fail to see how the names of the roads that Jackson, Reed, and Martin drove on the morning of the murder, or the fact that Martin drove away when he heard the gunshot, in any way impacted on Jackson's "culpability" for the crime. In addition, while Jackson's removal and discarding of portions of his clothing in the woods after the crime may arguably relate to his culpabilityand the trial court cited this fact in its findings regarding the statutory mitigating circumstance that Jackson was acting under extreme duress or under the substantial domination of another personwe do not believe that this single extraneous matter influenced the trial court in making its sentencing determination. The trial court clearly considered all the statutory and nonstatutory mitigating circumstances offered by Jackson, see Part XXII of this opinion; the court found only one aggravating circumstance, that the murder was committed during the course of a robbery in the first degree; and the record reflects that the court properly weighed the mitigating and aggravating circumstances as required by law, see Part XXVI of this opinion.
As there is nothing in the record to suggest that the complained-of extraneous facts adversely affected the trial court's sentencing determination, we find that the inclusion of those facts in the sentencing order was harmless beyond a reasonable doubt.

XXIV.
Jackson contends that Alabama's method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (Issue XXVII in Jackson's brief to this court.) In Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App.1999), this court stated the following regarding this issue:
"The appellant's seventeenth argument is that Alabama's method of execution constitutes cruel and unusual punishment. However, both Alabama courts and the United States Supreme Court have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution as a means of capital punishment does not constitute cruel and unusual punishment. Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
___ So.2d at ___. See also Taylor v. State, [Ms. CR-97-2531, February 4, 2000] ___ So.2d ___ (Ala.Cr.App.2000); Williams v. State, [Ms. CR-98-1734, December 10, 1999] ___ So.2d ___ (Ala.Cr.App.1999); Woods v. State, 789 So.2d 896 (Ala.Cr.App. 1999); Griffin v. State, 790 So.2d 267 (Ala. Cr.App.1999); Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999); Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Cr.App.1999); Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999); Duncan v. State, [Ms. CR-95-1544, September 17, 1999] ___ So.2d ___ (Ala.Cr. App.1999); Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999); Maples v. State, 758 So.2d 1 (Ala.Cr.App.), aff'd, 758 So.2d 81 (Ala.1999); Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000); Smith v. State, 756 So.2d 892, 904 (Ala.Cr.App. *1041 1998), aff'd, 756 So.2d 957 (Ala.2000); Stewart v. State, 730 So.2d 1203 (Ala.Cr. App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Scott v. State, 728 So.2d 164 (Ala.Cr.App.1997), aff'd, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Williams v. State, 627 So.2d 985 (Ala.Cr. App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Thus, Jackson's argument is meritless.

XXV.
Finally, Jackson contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process and to a fair trial. (Issue XXVIII in appellant's brief.) We do not agree. The claimed errors to which Jackson refers have been determined to be without merit and we likewise find that the cumulative effect of those alleged errors does not require reversal. "Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater." Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998), aff'd. in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___ So.2d ___ (Ala.2000), citing Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also Woods v. State, 789 So.2d 896 (Ala.Cr. App.1999); Griffin v. State, 790 So.2d 267 (Ala.Cr.App.1999); Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Cr.App.1999); Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999); Whitehead v. State, 777 So.2d 781 (Ala.Cr. App.1999); Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).

XXVI.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Jackson's capital-murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Jackson's sentence in accordance with § 13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Jackson's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in which the death penalty was imposed, considering both the crime and the defendant.
After the jury convicted Jackson of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being *1042 properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Jackson to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense.
In its findings, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while Jackson was engaged in the commission of a robbery in the first degree, see § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that Jackson had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975; and (2) that Jackson was 19 years old at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. In addition, the trial court found the following to constitute nonstatutory mitigation: (1) that Jackson exhibited good behavior while in jail awaiting trial; and (2) that Jackson apologized to the victim's family and his own family during the sentencing hearing. The trial court also noted that it found "little" in Jackson's character to constitute nonstatutory mitigation.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Jackson to death. The trial court's findings concerning the aggravating circumstance and the mitigating circumstances are supported by the evidence.
Jackson was convicted of the offense of murder committed during the course of a robbery in the first degree. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Sneed v. State, 783 So.2d 841 (Ala.Cr.App.1999); Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___ (Ala.Cr.App.1999); McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In fact, two thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of murder-robbery. McNair, supra.
After carefully reviewing the record of the guilt phase and the sentencing *1043 phase of Jackson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case. Considering the crime committed, and Jackson, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Jackson's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] Reed was convicted of murder made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975, and was sentenced to life imprisonment without parole. We affirmed Reed's conviction and sentence in an unpublished memorandum issued on March 26, 1999. See Reed v. State, (No. CR-97-1380) 767 So.2d 412 (Ala.Cr.App.1999)(table).
[2] That plea was withdrawn before the case was submitted to the jury.
[3] Rule 19.3, Ala.R.Crim.P., was subsequently amended, in December 1997, after Jackson's trial, to conform with § 12-16-9, Ala.Code 1975.
[4] Jackson does contend that he objected to the court's instructions after the voir dire examination of the first panel of prospective jurors; however, the record belies this contention. The record reveals that what Jackson characterizes as an objection to the content of the court's instruction was actually an argument in support of Jackson's challenge for cause of one of the prospective jurors, not an objection to the court's instructions.
[5] Rule 9.1, Ala.R.Crim.P., has since been amended to allow a capital defendant to waive his right to be present at all stages of the proceedings except sentencing.
[6] We also note that it is well settled that "`"[a]s long as one reason given by the prosecutor is sufficiently race-neutral, a determination concerning any other reason given need not be made."'" Brown v. State, 705 So.2d 871, 874 (Ala.Cr.App.1997), quoting Wood v. State, 715 So.2d 812, 816 (Ala.Cr. App.1996), aff'd, 715 So.2d 819 (Ala.), cert. denied, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998), quoting in turn, Johnson v. State, 648 So.2d 629, 632 (Ala.Cr.App. 1994). The State provided sufficiently raceneutral reasons for striking D.C., T.J., and J.S.the three jurors for which the State cited a criminal record as one of its reasons aside from their criminal histories; thus, a determination concerning the criminal histories as a race-neutral reason is, in fact, unnecessary.
[7] Arguably, Smith's testimony was not even incriminating. Nowhere in Smith's testimony is Jackson implicated in the crime.
[8] While the trial court stated that Jackson and Reed "hid their clothes together" after the crimea fact not supported by the evidence introduced at Jackson's trial, see Part XXIII of this opinion, wherein we hold that the inclusion of such extraneous matters was harmless errorthe trial court's finding that Jackson was not acting under duress or under the substantial domination of another person was fully supported by other evidence.